550 So.2d 891 (1989)
Sophia Duncan ROBERSON, Individually and as Tutrix for her Minor Children, Jeramie Jerome Roberson, Kenyetta Rene Roberson and Sherry Yvonne Roberson, Plaintiffs-Appellees,
v.
STATE of Louisiana Through DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT, Defendant-Appellant.
No. 20834-CA.
Court of Appeal of Louisiana, Second Circuit.
September 27, 1989.
Writ Denied November 7, 1989.
*893 William J. Doran, Jr. and Frank J. Gremillion, Baton Rouge, for defendant-appellant.
Francis M. Gowen, Jr., and Bowers & Bowers by Gary A. Bowers, Shreveport, for plaintiffs-appellees.
Before HALL, SEXTON and HIGHTOWER, JJ.
HIGHTOWER, Judge.
State of Louisiana, Department of Transportation and Development (DOTD), appeals a trial court judgment finding it liable to plaintiffs, the surviving widow and minor children of Edgar B. Roberson, for damages sustained as the result of a vehicular accident. For the reasons indicated, we reverse.

FACTS
At approximately 5:00 a.m. on Sunday, December 20, 1981, Mr. Roberson and his family were driving from Bossier City into Shreveport on the Interstate 20 bridge. A light rain was falling and it was cold, but the Robersons did not expect any icy conditions. Indeed, the preceding day had been warm. After crossing over the river and traveling a few feet past the Spring Street exit on the Shreveport side, they encountered a layer of ice on the roadway. As they did so, the Roberson automobile, after coming in contact with a disabled white car which was blocking both lanes of travel, slid toward the bridge railing, then back into the roadway, and finally came to a stop. The family exited and took refuge on the curb adjacent to the railing. Shortly thereafter, a large truck, owned by Haliburton Company, apparently lost control on the same layer of ice and struck the rear of the Roberson vehicle. The collision in some manner caused Mr. Roberson to fall off the elevated highway to the ground below, resulting in his death.
Earlier, at about 2:30 a.m., the National Weather Service had issued a statement noting the possibility of freezing rain moving into the Shreveport area during the early morning hours. A second statement was broadcast at approximately 3:00 a.m. Neither announcement was received by DOTD. As he prepared to go hunting, an employee of DOTD noticed ice forming on the top of his truck at approximately 4:00 a.m., and immediately called his supervisor concerning the discovery. That supervisor, Ray Rigdon, who was in charge of DOTD maintenance in the Shreveport-Bossier area (District 4), quickly checked the cablevision weather report, and then called Roy Boyett, the Bossier Parish maintenance superintendent. Boyett was directed to drive over the interstate highway, checking bridges and elevated portions for icing so that salt could be taken to those locations if such conditions were found.
Boyett proceeded to drive over the interstate from Bossier City to Shreveport and then back. In traversing the Red River Bridge, he found no ice except at the top of the bridge where some was just beginning to form on the railings. There was no ice on the roadway itself nor near the Spring Street exit, and traffic was moving in both directions. The conditions were reported to the District Office at about 4:15 a.m., and crews were then immediately called out and salt trucks loaded. Boyett later went on to other locations looking for ice formations on the interstate system. The crews called out, however, were unable to begin salting roadways before the accident.
Plaintiffs' subsequent suit alleged DOTD to be negligent in (1) failing to receive and act upon the National Weather Service advisories broadcast earlier that morning, and (2) failing to warn motorists after actually discovering hazardous conditions on the *894 bridge. The theory of strict liability was also asserted. Claims based on negligence were additionally advanced against the Louisiana Department of Public Safety (State Police), but later settled and dismissed. The City of Shreveport was likewise dismissed after being, at one point, named as a defendant. Haliburton was not sued.
The trial judge awarded plaintiffs damages in the amount of $614,618.62, after finding DOTD guilty of negligence which was a direct cause of the death of Mr. Roberson. Specifically, the lower court concluded that DOTD was negligent in not maintaining in operation, and monitoring, at all times, a teletype machine capable of receiving weather bulletins from the National Weather Service; and in not having someone assigned to listen to the weather radio on a continuous basis. Failing to take such actions, the court said, directly violated DOTD policy provisions. Secondly, the trial court opined that the two weather statements issued by the National Weather Service, but of which DOTD was unaware, amounted to constructive notice of the possible weather conditions, a notice which provided sufficient time to alleviate weather conditions on roadways. Finally, the court ruled that actual notice of the ice formation arose for DOTD upon Boyett's examination of the bridge railing, and that the failure of its employees to thereafter secure the bridge until salt trucks arrived, as well as to set flares or turn on emergency flashers on Boyett's truck, constituted negligence.

NEGLIGENCE OF DOTD
In order to recover under the theory of negligence, a plaintiff must prove: (1) the conduct complained of was a cause-in-fact of the accident; (2) the defendant had a duty to protect plaintiff against the harm complained of; (3) defendant breached that duty; and (4) plaintiff was harmed by this breach of duty. Nix v. Brasly, 489 So.2d 1038 (La.App. 1st Cir.1986), Payne v. Louisiana Department of Transportation and Development, 424 So.2d 324 (La.App. 1st Cir.1982).
With respect to the duty owed by the State to individuals, it is well established that the State owes a duty to motorists to maintain highways in a reasonably safe condition and to remedy conditions creating an unreasonable risk of harm. USF & G Co. v. State Department of Highways, 339 So.2d 780 (La.1976); McKinnie v. Department of Transportation & Development, 426 So.2d 344 (La. App. 2d Cir.1983), writ denied, 432 So.2d 266 (La.1983); Nix v. Brasly, supra; Naylor v. Louisiana Department of Public Highways, 423 So.2d 674 (La.App. 1st Cir. 1982), writs denied, 427 So.2d 439 (La.1982). Before the State through the Department of Transportation and Development may be held liable for an accident caused by a condition that creates an unreasonable risk of injury, it must be shown that the Department had actual or constructive knowledge of the condition and a sufficient opportunity to remedy the situation or at least warn motorists of its presence. McKinnie v. Department of Transportation & Development, supra, Nix v. Brasly, supra.
The trial court found that District 4 of the Louisiana Department of Transportation and Development complied with LSA-R.S. 48:35, which provides for the adoption of minimum safety standards by DOTD with respect to highway design, construction and maintenance. However, it was decided that DOTD failed to comply with its own prescribed standards. In so holding, the trial court cited two portions of the District 4 emergency procedures outline, both portions being on the first page thereof:
*895
 STATE OF LOUISIANA REFERRED TO
 DEPARTMENT OF HIGHWAYS _____________________________
 _____________________________
 INTRADEPARTMENTAL CORRESPONDENCE _____________________________
 Post Office Box 38 _____________________________
 Shreveport, Louisiana 71161 _____ REFERRED FOR ACTION
 January 21, 1975 _____ ANSWER FOR MY SIGNATURE
 _____ FOR FILE
 _____ FOR YOUR INFORMATION
EMERGENCY PROCEDURES _____ FOR SIGNATURE
 _____ RETURN TO ME
 _____ PLEASE SEE ME
 _____ PLEASE TELEPHONE ME
 _____ FOR APPROVAL
 _____ PLEASE ADVISE ME
 _____ _______________________
 BY ____________ DATE ________
 BY ____________ DATE ________
 BY ____________ DATE ________
 BY ____________ DATE ________
 Mr. Robert G. Graves
 Chief Const. & Maint. Engineer
 Department of Highways
 Baton Rouge, Louisiana 70804
 Dear Mr. Graves:
 This will refer to your memorandum of January 16, 1975.
 The outline of the plans and procedures we use in case of emergencies
 such as hurricanes and/or flooding are in accordance with the enclosed
 "Annex A" of our Maintenance Manual and memorandum of November 14, 1974,
 from Mr. Dempsey D. White, Chief Engineer.
 The outline of the plans and procedures we use and follow for snow, ice,
 and other emergency conditions in our district is as follows:
 I. Alert Period
 (A) Public is notified by news media, etc., that hazardous
 driving conditions are predicted.
 (B) Crews are scheduled and notified for standby duty.
 (1) Weather machine in district office provides printed
 current weather conditions and forecasts at all times.
 We also have access to the restricted telephone number of
 the Weather Bureau.
 (C) District telephone and radio is maintained on a 24 hour - 7 days a
 week basis to receive calls from State Police, local authorities
 and the general public as to any emergency conditions.
 (1) An up-to-date listing of all Department personnel and
 contractor superintendents is kept so that any emergency
 reported can be promptly dispatched for appropriate handling.
 II. Operational Procedures
 (A) Equipment is kept in ready condition for meeting emergency
 conditions.
 (B) Adequate supply of materials is kept for emergency conditions.
 ________________________ _______
 RECOMMENDED FOR APPROVAL DATE
 ________________________ _______
 RECOMMENDED FOR APPROVAL DATE
 ________________________ _______
 RECOMMENDED FOR APPROVAL DATE
Emphasizing language from Paragraphs I(B)1 and I(C), the trial court interpreted the procedures to require DOTD to operate and monitor a teletype unit and a "weather" radio on a continuous "24 hour-7 day-a-week basis." It then found violations of these procedures in that the two night watchmen on duty on December 20, 1981 had never been instructed to operate the teletype machine, it was not a night watchman's duty to periodically check the teletype machine, and no one had the responsibility of checking the teletype unit on weekends from Friday at 4:00 p.m. until 7:30 a.m. on Monday. While Mr. Rigdon had a weather radio at the time of the *896 accident, it was at his home near the telephone and neither he nor anyone else was actually in charge of continually listening to radio updates.
On appeal, DOTD argues that it is unreasonable to interpret the District's procedures so as to require constant operation and monitoring of the teletype machine and weather radio on a on a 24-hour, 7 day a week, basis. We agree. More reflectively read, the emergency plan called for the teletype machine and a radio to be operated on a 24-hour constant basis during an alert that severe weather conditions were expected. The testimony of Mr. Rigdon indicated that much of the information received on the teletype has nothing to do with the Shreveport area. In fact, weather broadcasts for the Shreveport area occurred only at certain hours each day. Thus, much of the information received by constant monitoring would be useless. Also, it would be illogical to mandate constant monitoring of the teletype and weather radio during major portions of the year, times when nothing of significance would be broadcast.
While the night watchmen were capable of turning the machine on, testimony indicated they would have trouble interpreting weather reports. Hence, should the emergency policy provisions be read to necessitate constant monitoring, either additional training or additional employees would be required for that purpose. An undue burden and expense would thus be imposed on DOTD in order to provide services that are unnecessary during the great majority of the year.
Moreover, the very fact that these are emergency procedures suggests a design that they not be maintained constantly in operation. Few, if any, emergencies so persist or endure.
In Nix v. Brasly, supra, a case similar to the one at hand, plaintiffs alleged that DOTD was negligent in failing to constantly monitor its teletype machine. Testimony there indicated that constant monitoring occurred only when DOTD was aware of a critical situation in advance. That approach was found by the First Circuit to be neither unreasonable nor negligent. The court cited Coleman v. Houp, 319 So.2d 831, 833 (La.App. 3rd Cir.1975), which, in dealing with a similar issue, quoted and affirmed the district court:
"Counsel cites no cases and this court is aware of none which specifically require a highway department to have crews constantly alerted to cover iced bridges or that require a constant surveillance of weather conditions to anticipate the need for such action. The weather reports of the previous day and into the early part of the night do not indicate such a likelihood of bridges icing over as to require that the department have an overnight crew standing by.... the weather forecasts for the previous day were not such as to indicate the necessity for an overnight watch of weather conditions if such is ever so."
(Emphasis added).
Although Nix makes no reference to written procedures, the record before us reflects that District 4 promulgated its plan in response to a policy requiring such action from every district in the state in January 1975. In any event, we are impressed with the Nix rationale concerning an accident that occurred in 1982, a year after the present case arose. To impose a constant monitoring duty on DOTD would be unreasonable and unrealistic. The emergency policy instituted by District 4, appropriately read, established a duty to constantly monitor the teletype and radio bulletins when DOTD was aware that dangerous conditions were imminent. Mr. Rigdon testified that there was a verbal understanding that the Weather Service in Shreveport would initiate direct contact with DOTD about adverse weather systems moving into the area.
The present record shows no awareness by DOTD of potentially unfavorable conditions so as to trigger a duty to begin constant monitoring. Indeed, the weather involved was absolutely unexpected. Newspaper reports, filed in evidence, indicate that the weather was sunny and cold on Saturday, December 19, with cloudiness and warmer temperatures forecast for Saturday *897 night by the Shreveport Journal. Predictions of a 20 percent chance of rain for the day of the accident were also included in the forecast. Mr. Rigdon was not aware of any approaching severe weather conditions and testified that he first thought that the employee, who called about ice on his truck at 4:00 a.m., was playing a joke. That employee likewise testified that he was very surprised to discover the ice and noted his superior's amazement at the news. Mr. Boyett said the weather was "too pretty," and recalled, when Mr. Rigdon contacted him, "I thought he was crazy." There is simply no evidence to indicate that DOTD should have been on alert as to hazardous conditions.
Moreover, to hold that DOTD had constructive knowledge of the two teletype statements under these circumstances would be to impose upon that department a burden of anticipating atypical weather conditions, i.e., of expecting the unexpected, and then acting upon the basis of that anticipation. This record simply does not establish that DOTD had good reason to expect icing conditions. Compare McKinnie, supra.
Concisely, then, the trial court was clearly wrong in finding DOTD negligent for failing to constantly monitor its teletype and radio, and in holding that the two unreceived weather statements constituted constructive notice to that agency.
We again find support for our conclusion in Nix v. Brasly, supra. The First Circuit there refused to charge DOTD with constructive knowledge based upon weather bulletins not received when the teletype machines were not monitored, even though severe conditions were anticipated for the afternoon following the accident involved.
Additionally, while not crucial to our decision, it is questionable whether receipt, by DOTD, of the two weather messages would have caused the icy conditions on the bridge to be alleviated in sufficient time to avoid the accident. Mr. Rigdon stated it would have required from one hour and forty-five minutes to two hours to get his crews out and load the salt trucks. His testimony further indicated that, had he received the 2:30 a.m. or 3:00 a.m. advisories, the ice alert process of checking bridges would have been initiated. However, the record also reflects that salt trucks and crew were not routinely called out solely on the basis of adverse weather reports; and we note that, even here, the crews were not summoned until after the detection of actual formation of ice on the bridge railings. Testimony also indicated, quite surprisingly, that the salt was ineffective if placed on the road surface before ice formed as it would be blown away or destroyed. Thus, considering the circumstances presented, the interval between the placement of salt and the time of the accident doubtless would have been brief, even had the weather reports been received.
Finally, of course, the trial court concluded that DOTD, having actual knowledge of the icing conditions at 4:15 a.m., negligently failed to take steps at that time to secure the bridge or adequately warn the public of the dangerous conditions. Specifically, the trial court found that Mr. Boyett failed to set out flares or park his truck with flashing lights so as to warn motorists. Further, the court decided that the police could have been called to secure the bridge until salt trucks arrived.
The evidence clearly indicates that Mr. Boyett only discovered ice beginning to form on the railings of the I-20 bridge, not on the roadway surface of the bridge or the highway. He explained his failure to use flares or flashing lights to warn, stating that in the past such actions were largely ignored by motorists. John Glennon, plaintiff's expert in traffic engineering and highway safety, also questioned the sufficiency of yellow flashing lights, as well as mentioning that flares are not a very clear warning device and can sometimes confuse drivers. Moreover, warnings placed where ice initially formed on the railings would not have been located where the accident actually occurred, more than 50 yards to the west. It should also be mentioned that testimony by Mr. Boyett established that "Ice on Bridge" signs were up at each end of the bridge, and were there throughout the winter. Concerning the police, there is *898 no evidence whatsoever as to how quickly they would have responded, nor as to whether they would have chosen to close this interstate bridge when there was no ice on the roadway surface.
Thus, the record before this court does not support a finding that DOTD acted unreasonably or negligently in failing to take the actions mentioned by the trial court. Indeed, we are convinced that after the discovery of ice forming on the railing DOTD acted prudently in its mobilization to alleviate the icing conditions.
In summary, the record fails to prove any acts of negligence by DOTD.

STRICT LIABILITY
We next consider the claim of strict liability, under LSA-C.C. Art. 2317, which was not addressed by the trial court after DOTD was held to be negligent.
Plaintiffs suggest that the roadway of Interstate 20 near the Spring Street exit, where the accident occurred, was defectively designed or constructed, it being contended that a low flat spot existed between the drainage grates there and allowed water or condensation to accumulate. It is further asserted that the accumulation of water at that point facilitated the formation of ice, creating an unreasonably dangerous condition for which DOTD is strictly liable.
An injured party seeking Article 2317 recovery must only prove that "the thing" which caused the damage was in the care or custody of the defendant, that the thing had a vice or defect which occasioned an unreasonable risk of injury to another, and that the injury was caused by the defect. Shipp v. City of Alexandria, 395 So.2d 727 (La.1981). Public agencies may be found legally at fault under Article 2317 for things in their custody, and, at the time of the present accident, whether or not the agency had knowledge of the danger was irrelevant. See Shipp, supra; Jones v. City of Baton Rouge, 388 So.2d 737 (La. 1980); LeGrand v. State, 390 So.2d 957 (La.App. 2d Cir.1981), writ denied, 395 So.2d 1364 (La.1981). [LSA-R.S. 9:2800, adopted in 1985, now requires notice to the governmental body.]
Here, no issue stands concerning custody. We conclude, however, that plaintiffs have failed to prove the existence of a defect which created an unreasonable risk of harm.
Plaintiffs' expert, Mr. Glennon, testified that he visited the roadway in question on one occasion, and also inspected and reviewed photographs, slides and structural diagrams. He described the area, of which plaintiffs complain, as being located between two drainage grates and appearing low and almost flat. Since he did not notice any areas on the side of the roadway facilitating drainage, he opined that water would accumulate at that point. It was his conclusion that the circumstances caused the formation of ice in freezing temperatures and created a dangerous condition. He did not make any measurements concerning elevation of the area, nor did he view the section when it was wet or when water was draining off of it.
This testimony, however, is insufficient to demonstrate that a defect in highway design or construction created an unreasonable risk of harm. Without actually viewing the actions of water at this location, Mr. Glennon merely surmised that there may be drainage problems because of the horizontal nature of the site. This, of course, is an elevated highway, and the area in question is, as plaintiffs acknowledge, located between two drainage grates. Mr. Rigdon, who had supervisory maintenance responsibility for the interstate, had actually driven over the location in the rain. He testified that he had never observed any trouble with drainage there, nor had he received any reports of such problems.
Thus, the most direct evidence presented does not support Mr. Glennon's conclusion. And obviously, just the fact that an accident occurred at this location, where ice had formed, does not establish that an unreasonably dangerous condition existed because of highway design or construction. More pointedly, we are not convinced of the existence of a roadway defect so unreasonable as to justify the imposition of non-negligent *899 liability. See Shipp, supra. Hence, plaintiffs cannot prevail under the theory of strict liability.

CONCLUSION
For the foregoing reasons, based on our review of the legal and factual issues presented, we must reverse the judgment of the lower court and dismiss the suit at appellees' cost.
REVERSED AND DISMISSED.