851 So.2d 959 (2003)
Eileen GREGOR, et al.
v.
ARGENOT GREAT CENTRAL INSURANCE COMPANY, et al.
No. 2002-C-1138.
Supreme Court of Louisiana.
May 20, 2003.
Rehearing Denied September 5, 2003.
*961 Craig R. Nelson, Ward & Nelson, New Orleans, Counsel for Applicant.
Charles S. LaBarre, Leonard J. Cline, Jr., Gauthier, Downing, LaBarre, Beiser & Dean, Metairie, Counsel for Respondent.
JOHNSON, Justice.[1]
This matter arises from a suit filed by plaintiffs against several defendants, including the Department of Health and Hospitals (DHH)[2] for the wrongful death of Daniel Gregor, who died after eating raw oysters at a Louisiana restaurant. After trial on the merits, the trial court found DHH 75% liable and the restaurant 25% liable. The court of appeal affirmed. We granted DHH's writ application to determine the correctness of the lower courts' decisions. Gregor v. Argenot Great Central Insurance Co., et al., 02-1138 (La.6/21/02), 819 So.2d 336. After review of the record, we affirm in part, reverse in part, and reapportion the assignment of fault among the parties.

FACTS AND PROCEDURAL HISTORY
In 1990, Dr. Joel Nitzkin, the state health officer at the time,[3] expressed concern about the growing problem of vibrio vulnificus cases in Louisiana. Vibrio vulnificus, a naturally occurring salt water organism not dangerous to most people, can be dangerous to those persons with chronic health problems, including gastric disorders, liver diseases, and immune disorders. Proper cooking will kill the bacteria.
In August 1982, DHH issued to physicians and hospitals a "Monthly Morbidity Report" dealing with vibrio vulnificus infections. The report stated, "[b]ecause of the severity and high case fatality rate for the septicemia cases, physicians should warn patients with chronic underlying liver and kidney diseases and other conditions causing, or capable of causing, impaired immune responses, to avoid eating raw oyster." Despite DHH's warnings to physicians and communication with the seafood industry, the number of vibrio vulnifcus cases continued to increase. Dr. Nitzkin's concern regarding the bacteria ultimately lead to the amendment of the sanitary code to require restaurants serving raw oysters to provide warnings about vibrio vulnificus.
In August 1990, DHH published a notice of intent in the Louisiana Register, indicating its plan to implement such an amendment. Despite opposition from the Louisiana Restaurant Association (LRA), DHH published the rule requiring mandatory oyster warnings in the Louisiana Register in February 1991. The rule amended § 23:006-4 of the sanitary code to require restaurants that sell or serve raw oysters to provide clearly visible warnings about vibrio vulnificus at the point of sale.
§ 23:006-4 provides, in pertinent part:

*962 All establishments that sell or serve raw oysters must display signs, menu notices, table tents, or other clearly visible messages at point of sale with the following wording:
THERE MAY BE A RISK ASSOCIATED WITH CONSUMING RAW SHELLFISH AS IS THE CASE WITH OTHER RAW PROTEIN PRODUCTS. IF YOU SUFFER FROM CHRONIC ILLNESS OF THE LIVER, STOMACH OR BLOOD OR HAVE OTHER IMMUNE DISORDERS, YOU SHOULD EAT THESE PRODUCTS FULLY COOKED.
On July 25, 1996, Daniel Gregor was diagnosed with Hepatitas C, a liver disease, by the NABI Biomedical Center in Fort Myers, Florida. By stipulation of the parties, he was notified of his positive test result by a letter dated August 5, 1996, and was counseled personally about Hepatitis-C at the NABI Biomedical Center on August 9, 1996, 5 days before his trip to New Orleans. On August 14, 1996, Gregor came to New Orleans to visit his fiancee', Elizabeth Lyle. During this visit, Gregor, Ms. Lyle, and others visited Pascal's Manale, a local seafood restaurant and oyster bar for lunch. Pascal's Manale decided to post the required oyster warning above the oyster bar at its establishment, where approximately 75% of its raw oysters were sold and consumed. The other 25% of its raw oysters were ordered and consumed in the restaurant's dining rooms. Gregor and his party dined in the restaurant's Opera dining room where Gregor ordered and ate the half dozen raw oysters. He became ill soon thereafter and was admitted to the St. Tammany Parish Hospital on the next day, August 16, 1996.
On August 19, 1996, Gregor lapsed into a coma and subsequently died on August 25, 1996. The parties stipulated that the cause of Gregor's death was vibrio vulnificus sepsis and Hepatitis-C, with a secondary diagnosis of acute renal and liver failure. The parties further stipulated that Gregor contracted vibrio vulnificus sepsis through the consumption of the raw oysters on August 5, 1996 at Pascal's Manale which contained the bacteria. However, it is noteworthy that Dr. Joel Nitzkin testified that the incubation period for vibrio vulnificus is a range of 12 to 36 hours with most persons who get sick consuming the product 18-24 hours prior to the onset of illness. Dr. Louise McFarland (Chief Epidemiologist for the Office of Public Health) agreed that with oysters consumed between 12 noon and 2:00 p.m., and the onset of symptoms at 4:30 p.m. on that same day, this case was unusual because of the very short incubation period for bacteria to multiply enough to cause a serious infection. The parties also stipulated that the raw oysters consumed by Gregor were purchased by Pascal's Manale from Bez Oysters and Seafood, Inc., who purchased the raw oysters from Eddie's Quality Oysters, Inc. Despite this stipulation by the parties, an investigation by the Office of Public Health, Seafood Sanitation Unit confirmed that the oysters served to Gregor were harvested from private leases in California Bay, and Louisiana Bez Oysters and Seafood, Inc. purchased the oysters from Miro Mjehovic rather than Eddie's Quality Oysters, Inc.
Suit was filed suit on March 18, 1997 on behalf of Eileen and Francis Gregor, decedent's parents, and Elizabeth Lyle, the decedent's fiancee[4] against Pascal's Manale, *963 its insurer, Argenot Great Central Ins. Co., Bez Oyster and Seafood, Inc., Eddie's Quality Oysters, Inc., DHH, and the Louisiana Department of Wildlife and Fisheries. Prior to trial, plaintiff settled with Pascal's Manale and Argenot, and dismissed all other defendants, leaving DHH as the only remaining defendant.
After a judge trial, the trial court found that DHH negligently enforced the Sanitary Code and that such enforcement did not involve a discretionary function entitling DHH to immunity under La. R.S. 9:2798.1. The trial court apportioned 75% fault to DHH. The trial court, finding that Pascal's Manale to a large extent could reasonably rely on the sanitarian's approval of the signage, apportioned Pascal's Manale the remaining 25% fault for its negligent violation of the Sanitary Code. The court found no fault on the part of decedent, Gregor, after finding no evidence that he had ever been warned of the dangers of eating raw oysters during the consultation at NABI Biomedical Center on August 9, 1996. Likewise, the court found no fault on the part of the oyster wholesaler. The trial court rendered judgment in favor of plaintiff and against DHH in the sum of $450,000.00.
The court of appeal affirmed, agreeing with the trial court's conclusion that La. R.S. 9:2798.1 did not shield DHH from liability. The court found that the Sanitary Code's directive that establishments selling raw oysters "must" post this warning at the "point of sale" to be mandatory language, not allowing for choice or discretion. It found that because this provision requires a specific course of action, the discretionary function exception does not apply. The court further found that although the Code does not define the term "point of sale," such an omission does not require a finding that the discretionary function immunity applies.
The court of appeal also affirmed the trial court's apportionment of fault. The court reasoned that "[r]egarding the necessity and benefits of health warnings, DHH enjoys a far superior posture than Pascal's Manale. DHH is in the business of protecting the health of the citizenry of Louisiana, whereas Pascal's Manale is in the business of selling oysters."
From this ruling, DHH appeals.

DISCUSSION

Liability of DHH and applicability of La. R.S. 9:2798.1
We must first determine whether the court of appeal was correct in holding that the discretionary function immunity of La. R.S. 9:2798.1 is inapplicable, such that DHH can be exposed to liability in this case. Louisiana Revised Statute 9:2798.1(B) provides:
Liability shall not be imposed on public entities or their officers or employees based upon the exercise or performance or the failure to exercise or perform their policymaking or discretionary acts when such acts are within the course and scope of their lawful powers and duties. [Emphasis added.]
Section D of La. R.S. 9:2798.1 explains that its purpose "is not to reestablish any immunity based on the status of sovereignty but rather to clarify the substantive content and parameters of application of such legislatively created codal articles and laws and also to assist in the implementation *964 of Article II of the Constitution of Louisiana."[5]
The starting point for the interpretation of any statute[6] is the language of the law itself. Ginn v. Woman's Hospital Foundation, Inc., 02-1913, p. 9 (La.4/9/03), 842 So.2d 338, 344; Rougeau v. Hyundai Motor America, 01-1182, p. 5 (La.1/15/02), 805 So.2d 147, 151. Special rules for interpreting a statute (such as La. R.S. 9:2798.1) have been enacted by the legislative branch and are found in La. R.S. 1:1 et seq. Louisiana Revised Statute 1:3 provides, in pertinent part, that "[w]ords and phrases shall be read with their context and shall be construed according to the common and approved usage of the language" and the "word `shall' is mandatory." (Emphasis added.) Louisiana Revised Statute 1:4 provided that "[w]hen the wording of a Section [of a statute] is clear and free of ambiguity, the letter of it shall not be disregarded under the pretext of pursuing its spirit." The legislative branch also has provided general rules for interpreting laws in La. C.C. art. 9 et seq. See, in particular, La. C.C. arts. 9 and 11. We are bound by the language of a relevant law. Allen v. State, through the Ernest N. Morial-New Orleans Exhibition Hall Authority, 02-1072, p. 12 (La.4/9/03), 842 So.2d 373, 381.
The Louisiana Constitution of 1974 art. III, § 15(A) provides, in pertinent part, that "[e]very bill shall contain a brief title indicative of its object." (Emphasis added.) Thus, the title of a law may be examined to determine its purpose. Boutte v. Jefferson Parish Hosp. Sev. Dist. No. 1, 99-2402, p. 5 (La.4/11/00), 759 So.2d 45, 49. The title of La. R.S. 9:2798.1 is "Policymaking or discretionary acts or omissions of public entities or their officers or employees." After reviewing the title and substance of La. R.S. 9:2798.1, we must conclude that for purposes of this case its object is to provide immunity from liability for offenses and quasi offenses of public entities, as defined therein, when the acts or omissions of the public entities are policymaking or discretionary acts or omissions.[7]
Dictionaries are a valuable source for determining the "common and approved usage" of words. Louisiana Horsemen's Benevolent and Protective Assoc. 1993, Inc. v. Fair Grounds Corp., 02-1928, p. 5 (La.4/9/03), 845 So.2d 1039, 1042.
Louisiana R.S. 1:9 specifically provides that "[u]nless it is otherwise clearly indicated by the context, whenever the term `or' is used in the Revised Statutes, it is used in the disjunctive and does not mean `and/or'." Cf., La. C.C.P. art. 5056(2); La.C.Cr.P. art. 6(2); La. Ch.C. art. 108(2). In BLACK'S LAW DICTIONARY 987 (5th ed.1979), the word "or" is defined as a *965 "disjunctive particle used to express an alternative or to give a choice of one among two or more things" and indicates "an alternative between different or unlike things." In MIRRIAM-WEBSTER'S COLLEGIATE DICTIONARY 817 (10th ed.1999), the word "or" is defined as "a function word to indicate an alternative." Thus, the word "or" as used in the operative language of La. R.S. 9:2798.1 clearly and unambiguously demonstrates that the words "policymaking" and "discretionary" have different meanings. This is confirmed by their "common and approved" definitions.
BLACK'S at 1041 defines "public policy" as follows:
That principle of the law which holds that no subject can lawfully do that which has a tendency to be injurious to the public or against the public good. The principles under which the freedom of contract or private dealings is restricted by law for the good of the community. The term "policy," as applied to a statute, regulation, rule of law, course of action, or the like, refers to its probable effect, tendency, or object, considered with reference to the social or political well-being of the state.
In MIRRIAM-WEBSTER'S at 901 the word "policy" is defined as "a definite course or method of action selected from among alternatives and in light of given conditions to guide and determine present and future decisions." MIRRIAM-WEBSTER'S at 703 defines "making" as "the act or process of forming, causing, doing, or coming into being." Thus, "policymaking" in the public sector means the planning of a course of action for the social or political well-being of the state.
BLACK'S at 419 defines the word "discretion" as follows:
When applied to public functionaries, discretion means a power or right conferred upon them by law of acting officially in certain circumstances, according to the dictates of their own judgment and conscience, uncontrolled by the judgment or conscience of others. As applied to public officers means power to act in an official capacity in a manner which appears to be just and proper under the circumstances.
In MIRRIAM-WEBSTER'S at 332 the noun "discretion" is defined as "power of free decision or latitude of choice within certain legal bounds." The word "discretionary" is the adjective form of the noun "discretion."
When we interpret La. R.S. 9:2798.1, we are bound to give effect to all parts of it and cannot give it an interpretation that makes any part of it superfluous or meaningless, if that result can be avoided. Palmer v. Louisiana State Board of Elementary and Secondary Education, 02-2043, p. 5 (La.4/9/03), 842 So.2d 363, 367; Hollingsworth v. City of Minden, 01-2658 (La.6/21/02), 828 So.2d 514, 517.
DHH argues that the testimony and evidence establishes that the intent of the drafters of § 23:006-4 was to give DHH inspectors discretion when inspecting restaurants for compliance with § 23:006-4. DHH argues that the actual words of the regulation offer a variety of methods for compliance, which requires the use of judgment or choicei.e. "Discretion." It maintains that the first sentence of the regulation indicates three specific choices (signs, menu notices, or table tents), and a fourth general alternative if signs, menu notices, or table tents are not appropriate in a particular situation (other clearly visible messages). DHH also points to the testimony of Dr. Nitzkin that "different approaches would work well in different food service establishments because of the layout of the establishment... what would work in one restaurant *966 might not work in another." Thus, DHH maintains that its sanitarians inspecting restaurants serving shellfish necessarily exercise some degree of discretion in determining whether the restaurant is in compliance based on the unique physical layout and service arrangements of each restaurant. DHH argues that the sanitarian who inspected Pascal's Manale exercised such discretion in determining that the warning posted over the oyster bar met the required posting mandated by the regulation.
DHH also maintains that the underlying rationale for the regulation's choices to provide the public with a uniform warning in a variety of settingsindicates that discretion by the sanitarian should be used. Therefore, DHH argues that the lower courts erred in failing to find that it enjoyed discretionary immunity under La. R.S. 9:2798.1 to the sanitarian's decision that the warning over the oyster bar at Pascal's Manale satisfied the requirements of the regulation mandating a warning display at the point of sale.
Section 23:006-4 of the Sanitary Code requires that all "establishments that sell or serve raw oysters must display" a prescribed warning "at point of sale." The establishment has discretion in determining what method may be used to convey the warning because the warning can be conveyed by a sign, menu notice, table tent or other clearly visible message. However, no policymaking act or discretionary act is involved in determining where the warning must be given; it must be given AT THE POINT OF SALE.
In the instant case, the point of sale was at the table where the raw oysters were ordered for the decedent. The raw oysters were offered for sale in the menu at a certain price. This offer was accepted and the sale was consummated when the oysters were ordered. La. C.C. arts 2439 and 2456. This transaction did not take place in the room where the oyster bar and warning sign were located. There were no signs, menu notices, table tents, or other clearly visible messages conveying the warning in the room, or on the table, where the order was made. This violated Section 23:006-4.
In their briefs the relator and respondent applied La. R.S. 9:2798.1 as it was interpreted by the lead opinion on rehearing in Fowler v. Roberts, 556 So.2d 1 (La.1990), and its progeny. See, e.g., Jackson v. State, Dept. Of Corrections, 00-2882 (La.5/15/01), 785 So.2d 803; Hardy v. Bowie, 98-2821 (La.9/8/99), 744 So.2d 606; Archon v. Union Pacific Railroad, 94-2728 (La.6/30/95), 657 So.2d 987; Rick v. State, DOTD, 93-1776 (La.1/14/94), 630 So.2d 1271. The essence of this jurisprudence is summarized in Jackson, 00-2882 at 8, 785 So.2d at 809, as follows:
The immunity from liability for discretionary acts is essentially the same as the immunity conferred on the federal government by the exception in the Federal Tort Claims Act (FTCA). Fowler v. Roberts, 556 So.2d 1 (La.1989) (on rehearing). In Berkovitz v. United States, 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988), the United States Supreme Court developed the following two-step analysis to examine immunity under FTCA: (1) whether a statute, regulation, or policy specifically proscribes a course of action; and (2) whether the challenged action is grounded in political, economic or social policy. This Court adopted the Berkovitz inquiry to analyze the applicability of La.Rev. Stat. 9:2798.1, describing it as follows:
Discretion exists only when a policy judgment has been made. Judicial interference in executive actions involving public policy is restrained by the exception. Thus, the exception *967 protects the government from liability only at the policy making or ministerial level, not at the operational level.
Fowler, 556 So.2d at 15.
Initially, a review of the lead opinion on rehearing in the Fowler case shows that the starting point for interpreting La. R.S. 9:2798.1 therein was not the statute itself. Instead, the opinion starts with the premise that "[t]he discretionary function exception to state governmental liability established by the statute is essentially the same as the exception in the Federal Tort Claims Act." Fowler, 556 So.2d at 15. This premise is fatally flawed. The referenced provision of the FTCA is 28 U.S.C.A. 2680(a) that provides as follows:
The provisions of this chapter and section 1346(b) of this title shall not apply to
(a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused. [Emphasis added.]
A review of the Louisiana statute and the federal statute shows that their language is not essentially the same. The Louisiana statute applies to "policymaking or discretionary acts when such acts are within the course and scope of ... lawful powers and duties." The federal statute is limited to "the exercise or performance or the failure to exercise or perform a discretionary function or duty." Unlike the Louisiana statute, the federal statute does not provide that a "policymaking act" is separate and distinct from a "discretionary function or duty."
The Fowler opinion did not utilize the rules for interpreting Louisiana statutes that are found in the Revised Statutes and the Civil Code. Instead, it went to federal jurisprudence to interpret a dissimilar Louisiana statute to reach the conclusion that the immunity provided for in the Louisiana statute only exists when there is a discretionary act or function "grounded in social, economic or political policy." Fowler, 556 So.2d at 15. This quoted language is not found in the Louisiana statute. As indicated in the above cited quote for the Jackson case, the immunity has been further limited by the subsequent jurisprudence so that it now only applies "at the policy making or ministerial level, not at the operational level." A review of the Louisiana statute shows that it does not make a distinction between operational acts and ministerial or policymaking acts. Finally, the Fowler interpretation of La. R.S. 9:2798.1 improperly renders the word "or" meaningless and is an impermissible repeal of part of a substantive immunity right. Louisiana R.S. 9:2789.1 is clear and unambiguous. We are bound to follow it as written and give effect to all of its provisions.
For the foregoing reasons, the analysis given to La. R.S. 9:2798.1 by Fowler and its progeny is faulty.
DHH had a mandatory duty to properly enforce the sanitary code. La. R.S. 40:4 A. We find that DHH was negligent in failing to properly train its sanitarians and failing to properly provide them with interpretations of the Sanitary Code terminology, specifically as to what the term "point of sale" means. The result of this negligence is clearly seen in the actions of Mr. Robinson when he inspected Pascal's Manale. After observing that the restaurant had a raw oyster bar in the front of the restaurant displaying the required warning sign, Mr. Robinson testified that he did not *968 inquire as to where else, other than the oyster bar, raw oysters might be sold to customers in Pascal's Manale. Mr. Robinson testified that he believed that the one posted sign over the oyster bar met the requirement of § 23:006-4 because he believed that the warnings needed to be posted at each "establishment."
Disturbingly, the evidence reveals that 20-25% of the raw oysters sold at Manale were sold and served in the restaurant's dining area. Therefore, under Mr. Robinson's interpretation of the statute, 20-25% of consumers at Manale's would not receive the benefit of the required warning because none was included in menus, table tents or signs in the dining rooms. We find that this fallacious interpretation is the result of DHH's negligent failure to properly train its sanitarians for enforcement of § 23:006-4. DHH is now attempting to escape liability for its failure to train its sanitarians by claiming that the untrained sanitarians are themselves exercising policymaking discretion. We reject this argument and conclude that Mr. Robinson's decision in this case, that the warning over the oyster bar was in compliance with § 23:006-4, was not a decision grounded in social, economic, or political policy. It was operational negligence in enforcing the sanitary code. When the government acts negligently for reasons unrelated to public policy consideration, it is liable to those it injures. Archon, 657 So.2d at 996.
Accordingly, we hold that DHH is not entitled to immunity under La. R.S. 9:2798.1. The factual ruling of the trial court, affirmed by the court of appeal, that DHH negligently failed to enforce its own regulation is not clearly wrong (manifestly erroneous). Therefore, we affirm these portions of the court of appeal's decision.

Apportionment of Fault
Our next inquiry is whether the lower courts erred in their apportionment of fault. The allocation of fault between comparatively negligent parties is a finding of fact. Sims v. State Farm Automobile Ins. Co., 98-1613 (La.3/2/99), 731 So.2d 197, 199. As with other factual determinations, the trier of fact is vested with much discretion in its allocation of fault. Duncan v. Kansas City Southern Railway Co., 00-0066 (La.10/30/00), 773 S.2d 670, 680. Accordingly, an appellate court may only reallocate fault if it finds the trial court was clearly wrong or manifestly erroneous in its allocation of fault, even if the reviewing court would have decided the case differently had it been the original trier of fact. Hebert v. Brown Bottling Group, Inc., 98-0924 (La.10/30/98), 719 So.2d 1043, 1046.
DHH argues that the lower courts erred in holding it to a higher standard of expertise than Pascal's Manale, claiming that Pascal's Manale has superior knowledge as to where its customers order raw oysters. We agree. As stated above, DHH was negligent in its enforcement of the Sanitary Code regulation. The record reveals that a DHH sanitarian, untrained as to terminology of § 23:006-4, inspected Pascal's Manale four times prior to Gregor's death and never cited the restaurant for noncompliance with the regulation. DHH should, therefore, bear some portion of liability for the wrongful death of Gregor.
However, we find that the court of appeal's allocation of only 25% fault to Pascal's Manale is manifestly erroneous.
In Simeon, supra, after rejecting the theory of strict liability on the part of the restaurant and oyster supplier, we analogized the situation to a product liability case for failure to warn. There, we noted that "in the context of product liability *969 cases, we have held that in performing this duty a manufacturer is held to the knowledge and skill of an expert. It must keep abreast of scientific knowledge, discoveries, and advances and is presumed to know what is imparted thereby." Simeon, 618 So.2d at 852. We went on to state, "[w]e find it unclear from the record whether a reasonable retailer or wholesaler of oysters on September 6, 1986 would have known or should have known, when held to a standard of an expert, of the potential danger to certain people from eating raw oysters." Id. We therefore, remanded the case to the trial court to take further evidence on that issue.
In the instant case, DHH argues that by 1996, ten years after the cause of action arose in Simeon, retailers and wholesalers of raw oysters were well aware of the potential danger to persons with chronic ailments as well as the general public. The state agencies had provided free supplies of signs and brochures to the restaurants, and information to the general public through mass communication. By then, the regulation had been promulgated for five (5) years, with DHH seeking voluntary compliance from 1991 until August 1993, and then instituting full enforcement of the regulation thereafter.
The restaurants were well aware of the required oyster warning regulation and, in fact, expressed opposition to such warnings up until the time of enforcement. In 1990, the Louisiana Restaurant Association wrote to the Director of Public Health expressing its concern that mandatory signs would result in a drop in oyster sales. According to the LRA, its industry is the single largest retail employer in the state of Louisiana, and restaurant business (at that time) resulted in a $3.2 billion impact on the state's economy. The LRA proposed to meet with DHH officials to discuss alternatives to mandatory signage. In response, Dr. Nitzkin delayed promulgation of the final rule, scheduled public hearings and invited written comments. Despite strong opposition from the restaurant industry, the enforcement of the mandatory warnings began in 1993.
Certainly, by 1996, Pascal's Manale was fully aware of the warning requirement. It had the benefit of various publications and brochures made available by DHH to educate businesses and the public on the danger of eating raw shellfish. More importantly, Pascal's Manale certainly knew that it served approximately 25% of its raw oysters in its dining rooms. Despite this superior knowledge, it chose to employ only the sign posted in the oyster bar, and did not provide the mandatory warning to customers who ordered raw oysters from menus at tables in the dining rooms where 25% of the raw oysters were ordered and consumed.
There was testimony presented at trial that even the oyster warning sign posted above the oyster bar at Pascal's Manale was inadequate. At trial, DHH introduced excerpts from the deposition of Dr. Edward Karnes, a human factors expert in the field of warnings, who testified that the signage in Pascal's Manale at the oyster bar was inadequate because of its placement and because of the "visual clutter" that surrounded it. Dr. Karnes testified that there are approximately 30 placards on the one wall where the oyster warning sign is located. He testified further that the placement of the oyster warning was "the best example of camouflage for that notice that probably could be possible, other than turning it faced against the wall so it can't be read at all." He also stated, "you have an abundance of visual clutter in the area where the sign is located. If someone was going to attempt to purposefully make this sign inconspicuous, the location *970 chosen for the sign ... is a perfect example of achievement of that."
We find it clear from this testimony that not only did Pascal's Manale fail to give any warning to patrons who ordered raw oysters in its two dining rooms, it also failed to give adequate warning to its oyster bar patrons because of the clutter surrounding the signage. The court of appeal's decision failed to recognize Pascal's Manale's superior role in this failure to warn.
Under these circumstances, we find that Pascal's Manale is liable for the wrongful death of Gregor to the extent of no less than 50%. Accordingly, we reverse the decision of the court of appeal in so far as it allocates only 25% fault to Pascal's Manale. We hereby reapportion the percentage of fault: 50% to Pascal's Manale and 50% to DHH.

DECREE
The decision of the court of appeal that DHH is not entitled to discretionary immunity under La. R.S. 9:2798.1 is hereby affirmed. The court of appeal's allocation of fault is hereby reversed, and allocation of fault is reapportioned: 50% to Pascal's Manale and 50% to DHH.
Affirmed in part; Reversed in part.
CALOGERO, C.J., concurs and assigns reasons.
KIMBALL, J., concurs in part and dissents in part with reasons.
KNOLL and VICTORY, JJ., dissent and assign reasons.
CALOGERO, Chief Justice, concurs and assigns reasons.
I respectfully concur in the majority's finding that the Department of Health and Hospitals (DHH) is not entitled to discretionary or policymaking immunity for its acts or omissions under the provisions of La.Rev.Stat. 9:2798.1(B). I also concur in the majority's apparent determination that the allocation of fault under the circumstances of this case was clearly wrong and that the fault of the restaurant may be raised only to the lowest level the trier of fact could have reasonably assigned, or 50% in this case. See Clement v. Frey, 95-1119 (La.1/16/96), 666 So.2d 607.
Notwithstanding my concurrence in these findings, I disagree with the plurality opinion's decision to review the reasoning of Fowler v. Roberts, 556 So.2d 1, 13 (La.1989) (on rehearing), within the context of this case. Whether or not this court should choose at some point to revisit Fowler v. Roberts and its discussion of La.Rev.Stat. 9:2798.1(B), I do not see any compelling reason for the court to do so in this case, where neither party has challenged the analytical framework set forth in Fowler v. Roberts regarding La. Rev. Stat. 9:2798.1(B), and where the plurality's criticism of the Fowler v. Roberts decision has no effect whatsoever either upon the legal analysis of the case before us or upon its outcome.
In my view, the plurality perhaps misunderstands the issues presented and the positions taken up in Fowler v. Roberts. There, an applicant for a Louisiana driver's license suffered from a severe seizure disorder. Initially refused a license, he ultimately obtained one after submitting a detailed medical report saying he had been seizure-free for over a year. This license, however, had no restrictions other than the condition that the driver be required to use an automatic transmission. He later applied for a renewal of the license, and such request was granted without the requirement of submitting another medical report. While La.Rev.Stat. 32:403.2 requires every physically handicapped person to submit a detailed medical *971 report upon initial application for a driver's license, the statute also provides that the Department of Public Safety (DPS) "may waive the furnishing of said report by any person applying for a renewal license under the provisions of this Chapter." In accord with that statute, the DPS elected to waive the submission of a medical report in every renewal application filed by a physically handicapped driver, rather than establish any guidelines regulating when such medical reports may reasonably be waived. The defendant driver, however, began having frequent seizures, despite medication, and eventually caused an accident resulting in the deaths of two other people. The survivors filed suit against the DPS alleging the agency had breached the duty it owed to protect the public.
On original hearing, Justice Lemmon, writing for a majority that included Chief Justice Dixon and Justices Watson and Calogero, performed a duty-risk analysis as set forth in Pierre v. Allstate Ins. Co., 257 La. 471, 242 So.2d 821 (1970), and noted the five separate elements of a negligence case: duty, breach of duty, cause-in-fact, legal cause or scope of protection, and damages. The majority concluded the DPS has the duty, "when it knows that an applicant for a driver's license has a seizure disorder that may be dangerous either at present or in the future, to adopt reasonable procedures designed to ensure safety on the highways not only in the initial issuance of a license, but also in the continuation of the authority to drive." 556 So.2d at 8. The majority further reasoned that, given the purpose of this duty, the risk that a handicapped driver might harm other drivers while undergoing the effects of his condition was clearly within the scope of protection contemplated by imposition of this duty. Justices Cole and Marcus dissented, being of the opinion that the DPS had no duty either to monitor a handicapped driver, who was licensed after a doctor attested he was medically capable of operating a vehicle safely, or to adopt and follow such monitoring procedures.
Justice Dennis also dissented. However, he pointed out that the majority had omitted any discussion of whether the DPS was entitled to immunity from liability under La.Rev.Stat. 9:2798.1(B). Justice Dennis noted that, although sovereign immunity has been abolished, the state and its agencies are "protected from liability for the decisions of executive-branch employees and officers when those decisions involve the kind of basic policy issues typically involved in legislation." 556 So.2d at 10. He went on to say that this immunity "is essentially the same immunity known in federal law as the immunity for governmental conduct involving `discretionary functions or duties.'" Id., citing inter alia 28 U.S.C. § 2680(a) (Federal Tort Claims Act). Justice Dennis, after quoting at length a treatise on the federal immunity statute, applied federal precepts to the Fowler facts and concluded that the DPS could invoke governmental or discretionary immunity in that case because the agency's only fault consisted of its negligence in making law or governmental policy. 556 So.2d at 12. He reasoned that the DPS is "being held responsible for negligent policy making, rather than for any act or omission by its officers or employees in carrying out law or policy previously established by the Legislature or the DPS." Id.
The court granted the DPS's application for rehearing, and in response to Justice Dennis's admonition addressed the applicability of La.Rev.Stat. 9:2798.1(B) to the Fowler facts. On rehearing, Justice Watson, joined by Chief Justice Dixon and Justice Lemmon (concurring), echoed Justice Dennis's earlier observation that the Louisiana immunity statute protecting the *972 discretionary acts of DPS officers or employees is "essentially the same as the exception in the Federal Tort Claims Act." 556 So.2d at 15. Justice Watson noted, citing federal jurisprudence, that "[d]iscretion exists only when a policy judgment has been made," and that "the exception protects the government from liability only at the policy making or ministerial level, not at the operational level." Id. Justice Watson then went on to adopt the two-step test articulated in the federal jurisprudence, namely Berkovitz v. United States, 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988), which the plurality today criticizes. Justice Watson also noted two principles: (1) that the discretionary function exception does not bar a negligence claim if the official had no room to exercise a policy judgment, and (2) that a government which acts negligently for reasons unrelated to public policy considerations is liable to those it injures. 556 So.2d at 15-16. Justice Watson then concluded the DPS there was not entitled to immunity protection, because implicit in La.Rev.Stat. 32:403.2 was the requirement that the agency formulate policy and make rules to govern license renewals by handicapped persons, and not either waiving all renewal medical reports or making arbitrary decisions on an ad hoc basis. 556 So.2d at 16. He further reasoned, incorrectly perhaps, that when there are no standards to be applied by the agency employee, "and renewals are granted to all applicants, the operational decision to issue a renewal is not a discretionary act" entitled to immunity under La.Rev.Stat. 9:2798.1(B). Id. The rehearing decision then reinstated the original opinion as supplemented thereby.
Justice Dennis concurred in the result on rehearing, while adhering to his reasons originally expressed in dissent, because he believed the DPS had violated previously-established guidelines with regard to the submission and acceptance of the initial medical report when the physically handicapped driver first applied for a license. 556 So.2d at 17-18. And three justices, Cole, Marcus, and Calogero, dissented from the plurality decision on rehearing, being of the belief that the DPS was not negligently operating under an implied directive from the legislature, but rather that the DPS had made a discretionary, policymaking act entitled to immunity when it elected to waive all medical reports for all renewals by physically disabled persons, as it was at liberty to do under La.Rev.Stat. 32:403.2.
While the plurality today faults the Fowler decision on rehearing because it equated La.Rev.Stat. 9:2798.1(B) to the federal tort claim exception, 28 U.S.C. § 2680(a), and adopted federal jurisprudence applying the latter, I perceived no disagreement among the Fowler court's justices in that regard. The justices in Fowler disagreed, first, on whether the DPS had a duty to adopt monitoring procedures and to follow them and, second, on whether the legislature had implicitly directed the DPS to adopt such procedures, such that the DPS's failure to do so was a non-discretionary, operational-level decision not entitled to immunity under La. Rev.Stat. 9:2798.1(B). Although I dissented from the ultimate conclusion reached in Fowler v. Roberts on rehearing, none of the seven justices expressed opposition to comparing the Louisiana immunity provision to the federal tort claim exception or to adopting the two-step Berkovitz test.
In addition, the plurality opinion's own reasoning in the case before us today, in which I concur, belies any need for revisiting Fowler v. Roberts. The plurality recognizes that the DHH has made the decision to promulgate the warning requirement in the Sanitary Code, that the provision under review, § 23:006-4, required the establishment to place a warning of appropriate type "at point of *973 sale," and that La.Rev.Stat. 40:4(A) placed a duty upon the DHH to enforce that provision of the Sanitary Code. The Sanitary Code requirement allowed no discretion in where the warning was to be placed, the plurality reasons, such that the DHH negligently failed to enforce its own non-discretionary directive in not ensuring that an adequate warning was placed in the dining room or at the table, as well as at the oyster bar. Ante, p. 966. This findingthat the sanitarian had no discretion or choice in where to ensure placement of the warningobviates the need for a discussion as to whether the Fowler rehearing decision properly distinguished between "discretionary" acts or omissions and "policy making" acts or omissions within the meaning of La.Rev.Stat. 9:2798.1(B). Therefore, by its own reasoning, the plurality's discussion of Fowler does not affect the legal analysis in this case and has no ultimate effect on the outcome of this case. Consequently, I fail to see a basis for mounting such an attempt to undermine Fowler in the context of this case.[1]
Finally, it should be noted that the analytical framework set forth in Fowler v. Roberts on rehearing has been consistently cited with approval by this court, most recently in Jackson v. State, Dept. of Corrections, 00-2882 (La.5/15/01), 785 So.2d 803 (Traylor, J.), and Hardy v. Bowie, 98-2821 (La.9/8/99), 744 So.2d 606 (Victory, J.). In sum, while I concur in the holdings of the majority today, I disagree with the plurality's decision to reach out and review Fowler v. Roberts, and with its conclusion that the analytical framework established in Fowler v. Roberts is faulty.
KIMBALL, Justice, concurring in part and dissenting in part.
While I do not necessarily agree with the extent to which the majority opinion utilizes common dictionary meanings to support its interpretation of La. R.S. 9:2798.1, I do agree that this court's decision on rehearing in Fowler v. Roberts, 556 So.2d 1 (La.1990) was in error. I therefore subscribe to the majority's conclusion that DHH is not entitled to discretionary immunity under the provisions of La. R.S. 9:2798.1.
I disagree, however, with the majority's allocation of 50% fault to DHH. In my view, the record clearly establishes that although the negligence of DHH contributed to the injury, the fault of DHH was certainly not equal to that of Pascal's Manale. The responsibility of disseminating the warnings and making them clearly visible to patrons is rests primarily with Pascal's Manale. I would therefore allocate substantially less fault to DHH and more to Pascal's Manale.
KNOLL, Justice, dissenting.
I disagree that the Department of Health and Hospitals ("DHH") is liable under the circumstances of this case.
Louisiana Sanitary Code, Chapter XXIII, § 23:006-4, states that "[a]ll establishments that sell or serve raw oysters must display signs, menu notices, tables tents, or clearly visible messages at point of sale" with the statutorily proscribed warning. (emphasis added). Clearly, under the terms of the sanitary code, the affirmative duty to ensure that patrons are adequately *974 warned about the dangers associated with consuming raw shellfish is imposed upon the "establishments" that sell raw oysters, not the DHH. Under the circumstances of this case, the restaurant clearly possessed the superior capacity to know where the warnings would have had the greatest impact. Indeed, the DHH inspected Pascal's Manale and found that, based on all the objective evidence, the restaurant had posted the appropriate warning at its oyster bar. It was Pascal's Manale, alone, that knew that 20-25% of its customers ate raw oysters in the dining area.
Without question the DHH is statutorily imposed with the duty to enforce the sanitary code by La. R.S. 40:4(A). It is entrusted with countless responsibilities in order to protect the public health, one of which is to make sure warnings have been posted about the dangers of eating raw shellfish. There are thousands of businesses and restaurants in Louisiana that sell raw oysters, each different from the next. What is a "point of sale" at one, and thus requiring a warning, may not be a "point of sale" at another. In my view, the majority's interpretation places an undue burden on DHH and effectively makes DHH the insurer of the safety of its citizens.
This Court has made clear that liability will not be automatically assigned to a State regulatory agency for the malfeasance of a third party. Cormier v. T.H.E. Insur. Co., 98-2208 (La.9/8/99), 745 So.2d 1, 6. Furthermore, it has been recognized that the State is not the insurer of the safety of its citizens. Wilson v. State Through Dep't of Public Safety and Corrections, 576 So.2d 490 (La.1991). See also Guillot v. State Through Louisiana State Police, 364 So.2d 254 (La.App. 3 Cir.1978) ("[a]lthough the State has a duty to enforce its criminal laws, it is not liable for damages to individuals injured by criminal acts of others or by the State's failure to punish those criminal acts. To hold otherwise would, in effect, obligate the State to compensate the victims of crime."). Accordingly, I find the fault attributable to DHH to be minimal, if any, and does not rise to the level of actionable negligence.
For these reasons, I respectfully dissent.
VICTORY, J., dissenting.
In my view, the Department of Health and Hospitals is not liable to the plaintiffs under the facts and circumstances of this case.
NOTES
[1] Retired Judge Walter I. Lanier, Jr., assigned as Associate Justice Ad Hoc, sitting for Associate Justice Chet D. Traylor, recused.
[2] Plaintiffs, in their original Petition for Damages, erroneously referred to DHH as the Louisiana Department of Health and Human Resources (DHHR).
[3] The state health officer is the state official responsible for implementation and enforcement of the state sanitary code.
[4] By the time of trial, Gregor's brother, Tom Gregor, had been substituted as the plaintiff, since both Gregor's mother and father were now deceased. Ms. Lyle's claim was dismissed shortly after suit was filed pursuant to an exception of no right of action. La. C.C. art. 2315.2 limits persons who may bring a wrongful death action, and does not include "fiancee."
[5] Article II of the Louisiana Constitution provides for the distribution of governmental powers as follows:

§ 1. Three Branches
Section 1. The powers of government of the state are divided into three separate branches: legislative, executive, and judicial.
§ 2. Limitations on Each Branch
Section 2. Except as otherwise provided by this constitution, no one of these branches, nor any person holding office in one of them, shall exercise power belonging to either of the others.
[6] Legislation is superior to any other source of law and is a solemn expression of legislative will. La.C.C. art. 1 and 1987 Revision Comment (c) thereto and La. C.C. art. 2.
[7] La. R.S. 9:2798.1 is found in Chapter 2 (Of Offenses and Quasi Offenses), of Code Title V (Of Quasi Contracts, and of Offenses and Quasi Offenses), of Code Book III (Of Different Modes of Acquiring the Ownership of Things), of Title 9 (Civil Code Ancillaries) of the Revised Statutes.
[1] I also question whether the plurality's incomplete and cursory review might not invite unintended consequences. For example, at one point, the plurality emphasizes that La. Rev.Stat. 9:2978.1(B), unlike the federal jurisprudence applying the federal tort claim exception, makes no distinction between operational-level acts or omissions and ministerial or policy-making acts or omissions. Ante, p. 967. However, the plurality does not discuss what import this lack of a distinction would have on how a Louisiana court should apply La.Rev.Stat. 9:2978.1(B).