Judge ROLAND L. BELSOME.
_[iThis civil appeal hinges upon one major issue: was a donation made by Edward Wisner in 1914 to the City of New Orleans a perpetual trust? This donation has been the subject of decisions on various issues, but none have discussed the history of Edward Wisner. Given that our community has benefitted from his generosity for nearly a hundred years it seems fitting to acknowledge him.

HISTORY

Edward Wisner,[1] a philanthropist, banker and newspaper editor from Athens, Michigan, moved to Louisiana for health reasons and settled in New Orleans in the early 1900s. Initially he was struck by the swamps of Louisiana’s similarity to the low-lying Netherlands, where hard-working farmers had reclaimed vast acreage for cultivation. Over the course of a few years, Mr. Wisner acquired over one mil *393 lion acres of seemingly undesirable marshland along coastal Louisiana, and transformed “waste marshes ... into fruitful fields.” John A. Fox, The Wisner Estates Incorporated: Embracing Nearly a Million Acres of the Richest Land in America, Munder-Thomsen Press, 1917, at 10. As early as 1906, he began to assemble the land by digging canals and removing water by way of a steam [¡.pumping station. Mr. Wisner had a prophetic dream of transforming his community into a sanitary and profitable place with the help of modern engineering. His forethought for pumps and levees nearly 100 years prior to the devastation of Hurricane Katrina was truly insightful. Mr. Wisner’s original vision was to develop the land in order to access its fertile soil for agricultural purposes by emptying the water and converting the once useless acreage to farmland. He claimed that the “soil is the very cream of the earth and contains enough nitrogen ... and other plant foods to produce abundant crops for a thousand years without being exhausted.” Id. at 40. Mr. Wisner was so successful in his entrepreneurial efforts that he gained the moniker, “The Father of Reclamation.” Almost akin to P.T. Barnum, Mr. Wisner had no qualms with using hype in order to promote his dream. He styled himself as a prophet of fortunes, taking out advertisements and promoting the creation of a new Holland where “the wastelands of Louisiana, upon drainage, [were] transformed into some of the most valuable agricultural lands of any region. Cane, rice, corn, cotton, and vegetables of almost every description were in evidence.” Mr. Wisner boldly demonstrated the prolific bounty of his reclaimed lands by sending a 12.5-pound cabbage to The New Orleans Item, touting his farms as a place where crops never fail. A Peep at Paradis, Where Louisiana’s Agricultural Possibilities are Practically Proven and Former Swamp Lands are Shown Easy of Reclamation and Very Valuable, Times-Picayune, Oct. 14,1906, at 9.
The Wisner family was also civic-minded and involved in the community of New Orleans. Although they were recent transplants from the North, the Wisners did not hesitate to become devoted to their new city. Mrs. Wisner was on the board of the Poor Girls’ Haven, and Mr. Wisner was the President of the Louisiana | ^Development League. Their daughter, Elizabeth Wisner, was the first female Dean of the Tulane School of Social Work. Additionally, Mr. Wisner was elected Vice President of the National Drainage Congress and served on the board of directors at the First Unitarian Church of New Orleans. In 1907, he had the foresight to appeal to President Theodore Roosevelt to procure a large colony of storks to be domiciled in Louisiana to eat the crawfish “who are the greatest enemies of [the] levees” protecting this newly reclaimed land. Surprisingly, these birds are not indigenous to Louisiana, but “The Pelican State [became] a kind of stork State, anyhow. Let it hail the bird of Holland and give it a home forever and ever.” Wisner Wants the Stork; He May Appeal to ‘Teddy’, The New Orleans Item, July 7, 1907, at 26. This entrepreneur never missed an opportunity to advertise the potential of his newfound state. In 1909, Mr. Wisner prudently invited another Commander-in-Chief to the city, entertaining President Taft at the St. Charles Hotel and accompanying him to religious services. President at the Unitarian Church, The Daily Picayune, Nov. 1,1909, at 1.
Although he was known as the “Father of Reclamation,” it became clear that Mr. Wisner was so much more than just an innovative real estate developer. He was a pioneer and visionary, who intended on converting the marshland into “the most fertile farming section in the world,” with *394 the ability to support three million people. The Greatest Work in Louisiana, The New Orleans Item, July 26, 1909, at 4. He regarded the land reclamation process as a humanitarian obligation for the benefit of the city, and thought that when “food supplies are in the greatest demand, [the fulfillment of] a patriotic duty is not measured by gold alone.” John A. Fox, The Wisner Estates Incorporated: Embracing Nearly a Million Acres of the Richest Land in America, Munder-Thomsen Press, 1917, at 40.
' RLike many New Orleanians, Mr. Wis-ner had a great love for his city, and desired to fulfill his mission “to make good.” ‘Make Good,’ Slogan of Local Boosters, The New Orleans Item, February 28,1912, at 3. Consequently, in August of 1914, Mr. Wisner formally donated in trust 52,000 acres of marshland located on the most valuable tract in his possession; today part of this is known as Port Four-chon. The donation should not be taken lightly, considering the fact that Mr. Wis-ner was an outsider from the North, and within fifteen years of moving to New Orleans he decided to give a substantial portion of his estate to the city. The land was subsequently put into a 100-year trust for the use of four beneficiaries: the City of New Orleans, the Salvation Army, Charity Hospital, and Tulane University. Mr. Wisner’s benevolent contribution could not have come at a better time, because Charity Hospital was suffering from a budget deficit that would have resulted 'in the closure of several wards but for his generosity. Charity Hospital is in Need of Funds, The New Orleans Item, July 20, 1915, at 11. Predating any pension plans, Mr. Wisner’s insight is once again displayed in the original trust document providing for acreage and convalescent homes for retired firefighters, policemen, and teachers as well as playgrounds for the youth of our city. The stipulations of the Edward Wisner Trust indicate that he intended the city to use the funds for the beautification of New Orleans and for the education, health and recreation of the city residents. Fifty Thousand Acres Wet Lands Donated For City’s Future Needs, Edward Wisner Makes a Princely Gift for Educational and Other Uses, Municipality to Undertake Reclamation, The Daily Picayune, January 19,1912, at 5.
Mr. Wisner suffered from poor health in 1914 and was forced to amputate his leg. That adversity did not daunt his efforts “to realize the dream which will | smake Louisiana the richest farm State in the Union and New Orleans a world metropolis.” Edward Wisner Under the Knife, The Times-Picayune, Aug. 20, 1914, at 8. Shortly thereafter, Mr. Wisner, 55, died of cancer at his home located on the corner of Camp and First Streets. Edward Wisner, The Times-Picayune, Mar. 9, 1915. In the same year as his death, a Category 4 hurricane flooded much of his reclaimed land. At that time, the majority of the land was sold to H.H. Timken of Ohio, who would later become a large shareholder in the Louisiana Land and Exploration Company. Between 1916 and 1925 the reclamation efforts in St. Charles Parish were abandoned. Even if the hurricane had never made landfall, the reclaimed lands would have eventually suffered the same fate, because the cultivation of peat-like soil made it more acidic with each harvest and also compacted the soil, which lowered the land level by approximately four feet, making future farming undesirable.
Mr. Wisner’s statement that “we are still too close to his achievement to measure it truly, but already we have realized that it constitutes the beginning of a separate chapter in the history of Louisiana’s development” was correct as far as the ongoing financial benefit to the city was concerned. Edward Wisner Under the *395 Knife, supra. However,.the pecuniary assistance today is not a result of farming, but royalties from the offshore oil and gas industries. The profitable oil industry of southeastern Louisiana largely originated on Mr. Wisner’s reclaimed land. Today, his legacy is memorialized with a simple fountain located at the park in the West End of New Orleans, which fittingly “has virtually been reclaimed” from Lake Pontchartrain. Edward Wisner Shaft for New Orleans, The Times-Picayune, June 14,1915, at 5.
1 «FACTS
A timeline of the pertinent facts follows.
• August 4, 1914 — Mr. Wisner executed an inter vivos donation, whereby he donated approximately 50,000 acres of land[2] to the City of New Orleans in trust (the trust) for specific charitable purposes.[3]
• March 8,1915 — Mr. Wisner died.
• July 8, 1920 — The Louisiana Legislature enacted Act 167, which retroactively amended the Trust Code to provide that charitable trusts were perpetual, unless the trust instrument contained an express right to “dissolve, abolish, or destroy” the trust.[4]
• December 26, 1928 — Mary Wisner, Mr. Wisner’s widow, and their two daughters, Elizabeth Wisner, and Harriet Wisner Peneguy (the Wisner Ladies), filed suit to annul the 1914 donation in Civil District Court.
• September 17,1929 — The beneficiaries of the trust and the Wisner Ladies came to a compromise. (Compromise)
• April 1, 1930 — The trial court signed a final consent judgment. (Consent Judgment)
—The Consent Judgment settled four major disagreements among the parties: 1) the Wisner Ladies ratified and acknowledged the validity of the 1914 donation and trust; 2) the four original trust beneficiaries recognized the Wisner Ladies, collectively, as an additional beneficiary with a 40% interest in the trust, (the City — 34.8%, Tulane and ■ Charity — 12% each, and Salvation Army-1.2%); 3) the parties-agreed to hold the property in indivisión, foregoing their rights to segregation; and 4) the City Council was to create an Advisory 17Committee known as the “Edward Wisner Donation Advisory Commission,” which would be comprised of five members: the Mayor as chair, and four representatives from each of the beneficiaries.
• March 12, 1931 — The New Orleans City Council created the Edward Wis- *396 ner Donation Advisory Committee (Advisory Committee) by Ordinance 12,883 (Ordinance).[5]
• April 29, 2003 — The current by-laws were signed by Mayor C. Ray Nagin.

PROCEDURAL HISTORY

On December 10, 2012, Mayor Mitchell J. Landrieu, on behalf of the City of New Orleans, filed a summary proceeding regarding whether the Advisory Committee was public or private, and whether he must obtain advice and consent of the Advisory Committee, specifically, when using funds distributed to the City by the trust. On January 14, 2013, the Wisner heirs,[6] direct descendants of the Wisner Ladies, filed a summary application raising these issues, as well as the issues of whether the trust was perpetual, and whether the May- or breached his fiduciary duty as trustee and should be removed. The proceedings were consolidated and cross-motions for summary judgment were filed but not heard or ruled upon.
After a trial on the merits, the court found: 1) the Wisner trust was not perpetual, expiring in August of 2014; 2) the Mayor as trustee is not required to obtain the advice and consent of the trust’s Advisory Committee prior to making |sgrants of money from the City’s beneficial portion of the trust revenue; and 3) the Advisory Committee is a public body which is subject to the Louisiana Open Meetings Law. The trial court further declared the remaining summary judgment issues moot. The Wisner heirs, the Salvation Army, and LSU, as heir to Charity, appealed.[7]

STANDARD OF REVIEW

In reviewing a trial court’s findings of fact, appellate courts employ a “manifest error” or “clearly wrong” standard of review. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). The appellate courts review questions of law de novo to determine whether the trial court was legally correct. Lakeland Anesthesia, Inc. v. United Healthcare of Louisiana, Inc., 03-1662, p. 9 (La.App. 4 Cir. 3/17/04), 871 So.2d 380, 388.

DISCUSSION

The appellants raise four assignments of error: 1) The district court erred in refusing to issue a declaratory judgment that the trust is a perpetual pursuant to Act 167 of 1920; 2) the trial court erred in finding that the Mayor was not required to obtain the advice and consent of the Advisory Committee before distributing funds it received from the trust; 3) the trial court erred in declaring the Advisory Committee to be a public body; and 4) the district court erred in failing to declare that the Mayor has breached his fiduciary duty as trustee and in not ordering his removal and replacement.
Un their first assignment of error, the appellants argue that the trust is perpetual, and the trial court misapplied Act 167 [8] when it found that the trust will *397 expire in August of 2014. In particular, they claim that the trial court erred in finding that the 100-year term included in the trust instrument was an express reservation of Mr. Wisner’s right to “dissolve, abolish, or destroy” the trust under Act 167.[9]
As the Mayor argues, the land was donated to the City in trust for a 100-year term. The trust terms clearly provide that the trust terminates 100 years after its inception, which is August 4, 2014. However, the appellants argue that the exclusionary provision in Act 167, regarding the reservation of the right to “abolish, dissolve, or destroy,” refers to the right to revoke. He explains that under the trust code, a revocation causes the complete failure of the trust, whereas termination (or expiration) causes the trust to accomplish its purpose.[10] Therefore, |10they conclude that since the trust does not contain an express right to revoke (“abolish, dissolve, or destroy”), the trust remains perpetual.
Here, the issue is one of statutory interpretation: whether the legislators contemplated the right to “abolish, dissolve, or destroy” to include the termination or expiration of the trust by its express terms. The function of statutory interpretation and the construction given to legislative acts rests with the judicial branch of the government. Theriot v. Midland Risk Ins. Co., 95-2895, p. 3 (La.5/20/97), 694 So.2d 184,186. The rules of statutory construction are designed to ascertain and enforce the intent of the Legislature. Succession of Boyter, 99-761, p. 9 (La.1/7/00), 756 So.2d 1122, 1128; State v. Piazza, 596 So.2d 817, 819 (La.1992). Legislation is the solemn expression of legislative will and, thus, the interpretation of legislation is primarily the search for the legislative intent. Boyter, supra; Cat’s Meow, Inc. v. City of New Orleans through Dep’t of Fin., 98-601, p. 15 (La.10/20/98), 720 So.2d 1186, 1198. The Louisiana Supreme Court has often noted the paramount consideration in statutory interpretation is ascertainment of the legislative intent and the reason or reasons which prompted the Legislature to enact the law. State v. Johnson, 03-2993, p. 12 (La.10/19/04), 884 So.2d 568, 575; Theriot, 95-2895, p. 3, 694 So.2d at 186.
The starting point in the interpretation of any statute is the language of the statute itself. Johnson, 03-2993, p. 11, 884 So.2d at 575; Theriot, 95-2895, p. 3, 694 So.2d at 186. “When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the *398 intent of the legislature.” La. C.C. art. 9; Johnson, 03-2998, p. 12, 884 So.2d at 575. However, “when the language of the law is susceptible of different meanings, it must be interpreted as having the Inmeaning that best conforms to the purpose of the law.” La. C.C. art. 10; Fontenot v. Red-dell Vidrine Water Dist., 02-439, p. 7 (La.1/14/03), 836 So.2d 14, 20. Moreover, “when the words of a law are ambiguous, their meaning must be sought by examining the context in which they occur and the text of the law as a whole.” La. C.C. art. 12.
It is also well established that the Legislature is presumed to enact each statute with deliberation and with full knowledge of all existing laws on the same subject. Johnson, 03-2993, p. 14, 884 So.2d at 576; State v. Campbell, 03-3035, p. 8 (La.7/6/04), 877 So.2d 112, 117. Thus, legislative language will be interpreted on the assumption that the Legislature was aware of existing statutes, well established principles of statutory construction and with knowledge of the effect of their acts and a purpose in view. Johnson, 03-2993, p. 14, 884 So.2d at 576; Campbell, 03-3035, p. 8, 877 So.2d at .117. It is equally well settled under our rules of statutory construction, where it is possible, courts have a duty in the interpretation of a statute to adopt a construction which harmonizes and reconciles it with other provisions dealing with the same subject matter. La. C.C. art. 13; City of New Orleans v. Louisiana Assessors’ Retirement and Relief Fund,-05-2548, P. 17 (La.10/1/07), 986 So.2d 1,15.
Dictionaries are a valuable source for determining the “common and approved usage” of words. Gregor v. Argenot Great Cent. Ins. Co., 02-1138, p. 7 (La.5/20/03), 851 So.2d 959, 964. The word “dissolve” means “to officially end (something, such as- a marriage, organization, or agreement); to bring to an end: terminate.” [11] “Abolish” means “to officially end or stop (something, such as aj^law): to end the observance or effect of: annul.”[12] “Destroy”- means “to cause (something) to end or no longer exist: to cause the destruction of (something)[.]” [13] These terms are unambiguous and signify the legislature’s intention to include both the right to revoke (or nullify), and the right to terminate (or end). The appellants’ assumption that the legislature could only have contemplated one of the two terms (termination or revocation) because they have different meanings is fatal. These terms contemplate ending the trust, without specification as to the manner in which the end is brought about, e.g. termination or revocation.
Next, the Salvation Army contends that it was the intent of the legislature to modify trusts that contained a term and make those trusts perpetual, and to afford any other interpretation would make the law meaningless. This assertion is incorrect.
A review of the legislative history reveals that Act 107 was also enacted during the 1920 Legislative Session. Act 107 provided limited terms for trusts, in general; [14] Act 167 specifically covered charita *399 ble trusts. Reading Act 107 in conjunction with Act 167 makes it clear that the legislature excluded charitable trusts from the definitive terms established in Act 107, electing to make them perpetual, unless the document explicitly maintained the right to end the trust.
The trust provisions set forth a one-hundred year term for its existence; thus, the trust will end on August 4, 2014. It is obvious that these provisions serve as an | ^express reservation of the right to end the trust for the purposes of Act 167. To find otherwise, despite the inclusion of a termination clause, is nonsensical.
Since the Wisner trust is subject to the exclusion set forth in Act 167, the trust is not perpetual and will end in accordance with its terms. Thus, the trial court was correct in concluding that the trust expires in August of 2014.
In their second assignment of error,[15] the Wisner heirs and Salvation Army allege that the trial court erred in finding that the Mayor was not required to obtain advice and consent of the Advisory Committee in accordance with the express provisions of the Compromise, Consent Judgment, Ordinance, and by-laws. Particularly at issue is the Mayor’s failure to obtain the approval of the Advisory Committee before distributing the City’s share of the trust proceeds to grant recipients.
The Mayor responds that none of the other beneficiaries are required to obtain pre-approval regarding the manner in which they distribute their funds. He further explains that the trial court’s ruling is in congruence with the Compromise, which intended for the Advisory Committee to serve a limited administrative role relative to the trust corpus.
In its judgment, the trial court found that the Advisory Committee’s role was 1) advisory, and 2) limited , to trust matters. Thus, it concluded that the Mayor was not required to seek permission from the Advisory Committee relative to the distribution of trust proceeds allocated to the City. We disagree.
The Compromise was confirmed by the Consent Judgment. The terms of the judgment unambiguously required the creation of the Advisory Committee by City 114Council ordinance, and further stipulated that the Mayor, as Trustee, could not bind the parties without the approval of the majority of the committee members.[16]
Pursuant to the Consent Judgment, the City Council created the Advisory Committee by ordinance. The Ordinance authorized the Advisory Committee to adopt rules and regulations that it deemed advisable. Its functions were the “supervision, direction and administration of all the lands, funds and avails constituting and comprising the Wisner Donation, or the *400 avails and fruits thereof, and to consult with and advise the Mayor of the City of New Orleans in his capacity as Trustee upon all matters pertaining to said trust[.]” The ordinance further articulated that all matters of the trust must be “referred to and handled by” the Advisory Committee.
In accordance with its rule-making authority set forth in the Ordinance, the Advisory Committee established some additional rules. Article I, Section 5 of the current set of by-laws,[17] in particular, established that the Advisory Committee would function to provide advice and consent to the Mayor in relation to grant projects funded with the City’s share of the trust proceeds.[18]
The Mayor now questions the validity and enforceability of these earlier 1 ^agreements and suggests that we ignore the consequences of his predecessors’ acquiescence therein. More specifically, he has implicated that both the Compromise and Consent Judgment, approved by Mayor Walmsley, are invalid. However, such a claim or defense is not appropriate in a summary proceeding. See La. C.C. art. 2029 et seq.; and La. C.C.P. art.2001 et seq. While interesting and curious, an analysis of the language, circumstances, and prevailing case law that surrounded the Compromise and Consent Judgment is beyond the scope of the appeal in this matter.
Despite Mayor Nagin’s decision to accept the authority of the Advisory Committee to enact the pertinent by-law, the Mayor also suggests that the Advisory Committee exceeded its authority because the by-law concerned matters outside of the trust corpus. However, he never specifically requested or received a ruling on the validity of the by-law itself.[19] As a general matter, appellate courts will not consider issues raised for the first time, which were not pleaded in the trial court below and which the trial court has not addressed. Billieson v. City of New Orleans, 09-410, p. 8 (La.App. 4 Cir. 11/12/09), 26 So.3d 796, 801-02. Since the legitimacy of these Mayoral-approved agreements and enactments are not before us; our review is limited to the facts established in the record. Consequently, we must refrain from commenting on the wisdom of Mayors Walmsley and Nagin in connection with the ‘Wisner trust.”
| ii/The testimony and documentation admitted at trial makes it clear that the Mayor must obtain the advice and consent of the Advisory Committee, and may only act on trust matters with a majority vote. The record and the longstanding history of the trust confirm this fact. See California Co. v. City of New Orleans, 60 So.2d 103, 108 (La.App. 1st Cir.1952) (where the Court held that the Mayor was authorized to grant a lease upon advice *401 and approval of the Advisory Committee); and La. Atty. Gen. Op. 1986-0036 (opining that a lease signed by the Mayor, as trustee, without the approval of the Advisory Committee was not valid and binding). While the trial court is correct in its assertion that neither the trust, the Compromise, nor the relevant City Council Ordinance require any beneficiary to obtain pre-approval regarding the distribution of funds received from the trust; it ignored the fact that the 2003 by-laws delegated this function to the Advisory Committee. Moreover, this procedure was observed long before the by-laws were put into place. Thus, by-passing the Advisory Committee’s rule with respect to this function constituted a breach of the by-laws.
Based on the facts evident in the record, we must find that the trial court was clearly wrong in finding that the Mayor was not obligated to obtain the advice and approval from the Advisory Committee before allocating the City’s share of the trust proceeds to grant recipients pursuant to Article I, Section 5 of the 2003 bylaws.
In their third assignment of error, the Wisner heirs and Salvation Army claim that the trial court erred in declaring the Advisory Committee to be a public body subject to the Open Meetings Law. The appellants cite to the trial court’s failure to consider the two-part test set forth in Louisiana High School Athletic Ass’n, Inc. v. State, 12-1471 (La.1/29/13), 107 So.3d 583 (referred to as the 117LHSAA decision), and conclude that the Advisory Committee does not fall within the definition of “public body.”
Pursuant to the Open Meetings Law, La. R.S. 42:13(A)(2) states:
“Public body” means village, town, and city governing authorities; parish governing authorities; school boards and boards of levee and port commissioners; boards of publicly operated utilities; planning, zoning, and airport commissions; and any other state, parish, municipal, or special district boards, commissions, or authorities, and those of any political subdivision thereof, where such body possesses policy making, advisory, or administrative functions, including any committee or subcommittee of any of these bodies enumerated in this paragraph.
In LHSAA, the Louisiana Supreme Court overruled Spain v. Louisiana High School Athletic Association, 398 So.2d 1386 (La.1981), which found that the LHSAA was a public body for the purposes of the Open Meetings Law. The LHSAA Court focused on the plain reading of the words defining “public body,” and explained that Black’s Law Dictionary defined “committee” as a “subordinate group which a deliberative assembly or other organization refers business for consideration, investigation, oversight or action.” Thus the Court concluded that the phrase “committee or subcommittee” of any of the public bodies refers to “a committee formed by the public body itself.”
After considering that there was no evidence to suggest that the LHSAA was formed as a committee of a public body; no public body ever referred business to the LHSAA for its consideration, investigation, oversight or action; and the LHSAA, a non-profit corporation, had separated itself from any public entities, the Supreme Court overruled Spain and found that it was not a public body as defined in the Open Meetings Law.
| iSHere, the exact opposite is true. The City Council, an indisputable public body, formed the Advisory Committee, and referred to it the authority to control, “all *402 matters relating to said trust.”[20] Among the functions granted to the Advisory Committee by the City Council were “supervision, direction, and administration[.]” Given the plain language in Open Meetings Law and the LHSAA decision, it is glaringly obvious that the Advisory Committee meets the definition of a public body. Therefore, the trial court was correct in holding that the Advisory Committee was subject to the Open Meetings Law.
In their final assignment of error, the Wisner heirs and Salvation Army assert that the district court erred in failing to find that the Mayor has breached his fiduciary duty as trustee and order his removal and replacement.[21] In particular, they contend that the Mayor usurped the advice and consent functions of the Advisory Committee when he delegated control over the grant making process to his appointees. They also contend that the Mayor’s collateral attack on the validity of Consent Judgment demonstrates his hostility toward the beneficiaries he was obligated to protect.
|! ^Louisiana law provides that the trustee has the duty to administer the trust in the interest of all beneficiaries impartially. La. R.S. 9:2082. The removal of a trustee is governed by La. R.S. 9:1789, which states in pertinent part: “[a] Trustee shall be removed in accordance with the provisions of the Trust instrument or by the proper court for sufficient cause” (emphasis added). However, it takes more than just technical violations of the Trust Code or mere hostility or animosity between the Trustee and beneficiary to establish sufficient cause for removal. Fer-tel v. Brooks, 02-846, p. 10 (La.App. 4 Cir. 9/25/02), 832 So.2d 297, 304 (citation omitted); See also, In Re Mashburn Marital Trusts, 06-741 (La.App. 1 Cir. 12/28/06), 951 So.2d 1136.
In the instant case, the record reflects that the Mayor side-stepped the Advisory Committee in the grant making process, and distributed the City’s proceeds from the trust to grant recipients without first obtaining the advice and consent of the Advisory Committee. As already discussed, this is a breach of the by-laws, rather than the trust or Consent Judgment. Besides, the appellants overlook the fact that the Mayor, representing the City, serves dual functions with respect to the trust: first, as Trustee; second, as a beneficiary. The proceeds of the trust are distributed to the Mayor, as the Chief Executive Officer of the beneficiary of the trust, not as Trustee. Thus, the Mayor, as a beneficiary, received the proceeds from the trust and committed the breach. The Mayor, as Trustee, is in no way implicated in this breach.
|2nThe record is void of any evidence to suggest that the Mayor, as Trustee, misap *403 propriated any assets of the trust, or otherwise breached his duties as Trustee. Contentious disagreements over complex matters of the trust, which have been the subject of litigation since its inception, are not a sufficient cause for removal of the Mayor, as Trustee. See Fertel, supra. Considering the lack of evidence in the record, we cannot say that the trial court was clearly wrong in refusing to order removal of the Mayor as Trustee for breaching his fiduciary duties.
In light of the foregoing discussion, the trial court’s ruling that the Mayor was not required to obtain the approval of the Advisory Committee before distributing proceeds of the trust to grant recipients is reversed. The remainder of the trial court’s ruling is affirmed.
AFFIRMED IN PART, REVERSED IN PART
*404 APPENDIX A
[[Image here]]
Edward and Elizabeth Wisner Papers. [Photograph of Edward Wisner]. Manuscripts Collection 10í7, Louisiana
Research Collection, Howard-Tilton Memorial Library, Tulane University, New Orleans, Louisiana.
*405 TOBIAS, J., concurs in part and dissents in part.
LOBRANO, J., concurs in part and dissents in part with reasons.

. See Appendix A.

. The land was located in three parishes: La-Fourche (Port Fourchon), Jefferson, and St. John. The lands in Port Fourchon are leased to various companies involved in deep water oil exploration projects, making the land a valuable asset. In 2012, it produced nearly $8 million dollars in revenue.

. Act 167 provided, in relevant part:
Whenever one or more persons have donated, subscribed, or contributed to a sum of money or other property and have dedicated it, in a manner, to some charitable, benevolent, or eleemosynary use, and have not expressly reserved in the dedication the right to dissolve, abolish, or destroy the trust or dedication made, the trust or dedication shall continue, forever, so long as there is a competent person or institution to administer it (emphasis supplied).

.Notably, the terminology used in the Ordinance differs from that in the Consent Judgment Specifically, the Consent Judgment provides for the creation of the "Edward Wisner Advisory Commission,” and the Ordinance created the "Edward Wisner Donation Advisory Committee” (emphasis supplied). This distinction is inconsequential since the members, powers and functions of the Committee were the same as those set forth for the Commission.

. Wendell Cook, Jr., Richard Peneguy, Jr., Edward Peneguy, Jr., and Mark Peneguy.

. Tulane University did not file an appeal.

. As discussed, Act 167 of 1920 applied retroactively and made charitable trusts perpetual, unless the right to abolish, dissolve, or destroy it was expressly reserved within the instrument.

. The trust contains the following provisions:
[A]ppearer declared that he does, by these presents, donate, assign, set over, transfer, abandon, and deliver, irrevocably and forever, with all legal-warranties and with full subro-gation and substitution in and to ...
This donation is made to the City of New Orleans for the benefit and use, either through the revenue or ultimate sale of the property hereinabove described and hereby conveyed, of the following beneficiaries ... The trusteeship herein provided for shall exist for the term and period of one hundred (100) years from the date hereof, and this donation is made upon the condition that the said City of New Orleans shall in no way alienate any
part or portion of the lands herein conveyed until one hundred (100) years from the date hereof, except as hereinafter provided for (emphasis supplied).
After expiration of the said one hundred (100) years, the said City of New Orleans shall be free to dispose of any or all of said lands in such manner as the City Government may direct, but employing the proceeds thereof for the purposes above set forth only.

. The distinction between termination and revocation was noted in the 1964 Comments to tire Louisiana Trust Code; however, this was 50 years after the trust was executed, and 44 years after the enactment of Act 167.

. Dissolve Definition, MERRIAM-WEBSTER, http://www.merriam-webster.com/ dictionary/dissolve (last visited July 9, 2014).

. Abolish Definition, MERRIAM-WEBSTER, http://www.merriam-webster.com/dictionary/ abolish (last visited July 9, 2014).

. Destroy Definition, MERRIAM-WEBSTER http://www.merriam-webster.com/dictionary/ destroy (last visited July 9, 2014).

. In particular, a trust would expire ten years after the donor's death or ten years after the beneficiary attained the age of majority.

. Although the first assignment of error is dispositive of the issue regarding the termination of the trust, we address the remaining assignments as they may pertain to its dissolution.

. The Consent Judgment provides the criteria by which the Commission Council (City Council) was to create an advisory committee, composed of five members, to be known as the "Edward Wisner Donation Advisory Commission.” The Consent Judgment states in relevant part: “the Mayor of the City of New Orleans, with the approval of the Commission Council (or its successor body), may act as such Trustee upon the advice and with the consent of the majority of said Commissioners, and such action, so authorized, shall be binding on all parties hereto.” Reference to obtaining the advice and consent of "said Commissioners” clearly signifies the members of the Advisory Commission (or Committee) not the City Council. Any other interpretation would render the language in the Consent Judgment and subsequent Ordinance meaningless.

. As required by the Ordinance, the 2003 bylaws were adopted by a majority vote of the members of the Advisory Committee and signed by Mayor C. Ray Nagin.

. Article I, Section 5 of the 2003 by-laws stated that the Advisory Committee would "provid[e] advice and consent to the Mayor in respect to funding of projects with moneys received from the Donation by the City of New Orleans as beneficiary for the uses and purposes of municipal, charitable, and educational purposes within the city.”

.Instead, the City focused on the provisions set forth in the Compromise and Ordinance, and disregarded the pertinent by-law. As discussed, the Compromise and Ordinance require the approval of the Advisory Committee. The Ordinance further delegates rule-making authority on trust matters to the Advisory Committee. Thus, it is broad enough to encompass the relevant bylaw. Since the authority of the Advisory Committee to pass the by-law was never challenged, and there is no trial court ruling regarding its enforceability, the issue is not properly before this Court.

. The appellants argue that in creating the Advisory Committee, the City Council was not acting on its own initiative and was merely performing a ministerial duty in obedience of the consent judgment. However, motivations concerning the formation of the ordinance are irrelevant to our analysis. The fact that the parties to the judgment consented to the creation of the Advisory Committee to oversee the trust, does not serve to undermine its identity as a public body. In addition, it is extremely problematic to conceive that a public body such as the City Council could circumvent the Open Meetings Law by creating a non-public body to oversee public matters.
They also cite to California Co. v. City of New Orleans, 60 So.2d 103 (La.App. 1st Cir. 1952), which is inapposite as it did not involve an issue with the Open Meetings Law.

. The trial court did not explicitly rule on this issue in its judgment; therefore, it is deemed to be a tacit denial of the claim. See VaSalle v. Wal-Mart Stores, Inc., 01-462, p. 8 (La. 11/28/01), 801 So.2d 331, 337 (where the Louisiana Supreme Court held when the trial court fails to rule on a demand raised by the pleadings, the silence in the judgment is deemed a rejection of the demand).