CRAIN, J.
|3The State of Louisiana through the Department of Transportation and Development appeals a judgment arising out of an automobile accident that occurred when motorists encountered ice on a bridge. Finding a reasonable basis in the record for the trial court’s factual findings, we affirm.
FACTS AND PROCEDURAL HISTORY
Unusually cold weather struck south Louisiana on Christmas Day in 2004. Early that morning, Donald Greene left Houma at about 5:00 a.m. to go to work. The weather conditions were cold and wet, but he did not see any snow or sleet. After traveling five or six miles, he came to Prospect Bridge, which crosses the Intra-coastal Canal. Greene traveled up the bridge without incident; however, on the downslope, his truck began fishtailing and impacted the left guardrail, then struck the right guardrail before coming to a stop on the bridge. Shortly after exiting his vehicle, Greene heard screeching tires and looked up to see a vehicle sliding sideways down the bridge toward him. Greene was struck and thrown over the bridge railing, falling approximately 75 feet to the ground below. The driver of the other vehicle, Alex Alvarado, and his guest passenger, Antonio Mendoza, were both killed in the collision, and Greene sustained severe injuries to his back.
Greene filed suit against Alvarado’s succession and DOTD, alleging .that DOTD had knowledge of the impending ice storm and negligently failed to inspect Prospect Bridge and sand or close the bridge before the accident. The parents of Alvarado, Ricardo Flores and Celia Alvarado, filed suit against Greene and his insurer, as well as DOTD. The two proceedings were consolidated, and the respective plaintiffs ultimately resolved and dismissed their claims against each other, leaving only the claims against DOTD. DOTD filed a motion for summary judgment asserting that no fault or negligence on its part caused or contributed to |4the accident, but the trial court denied the motion, and the claims proceeded to a bench trial.
At trial, the parties presented evidence from multiple witnesses, both fact and expert, and submitted numerous joint exhibits. The evidence established that Terre-bonne Parish rarely experiences winter weather events sufficient to produce ice on roadways or bridges. When such conditions are predicted, DOTD’s general procedure is to ensure that its maintenance crew for Terrebonne Parish, which operates out of a facility in Houma, is aware of the situation and that any necessary equipment and materials have been prepared in advance. The eight members of the maintenance crew are on standby, which means they must be available and ready to report to work when needed.
During such events, the goal is to keep roadways open by sanding problematic areas; however, sanding is a slow, laborious process, and if the conditions become too hazardous, roadways that cannot be safely traversed are closed. DOTD supervisory personnel have the authority to close roads due to ice, but the decision is usually made in consultation with, or at the direction of, the Louisiana State Police. When a decision is made to close a bridge or roadway, DOTD uses barricades to block access to the location, a process which, in contrast to sanding, is relatively easy and can be com *325 pleted in ten to fifteen minutes per location.
DOTD has designated five roadways and bridges in Terrebonne Parish as priority locations because of them propensity to freeze and heavier volume of traffic. Prospect Bridge, as well as the nearby “Twin Span Bridge,” are among the priority locations, although the top priority is US Highway 90, a high-speed roadway that stretches about nineteen miles across the northern part of Terrebonne Parish and has five interchanges. The DOTD facility in Houma is about eleven 1 ¡¡miles south of the nearest interchange for Highway 90. Prospect Bridge, the site of the subject accident, is about two and one-half miles from the Houma facility.
On December 22, 2004, Louisiana State Police Troop C issued a travel advisory providing, in relevant part, “As we begin our winter season, weather forecasters are currently calling for weather a little different [than we] are used to in south Louisiana, Although the possibility is slight, the current forecast calls for a [possibility of] snow in our area.” Two days later, on December 24, 2004, the National Weather Service issued a weather bulletin at 4:00 p.m. for several cities in south Louisiana, including Houma, confirming that a freeze was forecasted for southeast Louisiana that night and continuing into the Christmas morning hours.
The relevant events unfolding thereafter on December 25, 2004, are summarized as follows:
1:41 a.m. The National Weather Service issues a weather bulletin confirming that a winter weather advisory is in effect until 5:00 p.m. for upper Ter-rebonne Parish, which includes the Houma area. The bulletin states that cold arctic air in the region and a low pressure area from Gulf of Mexico will result in a wintry mix of rain, freezing rain, sleet and snow. General road conditions are not expected to be impacted, but overpasses and bridges may see some light icing conditions during the morning hours, and hazardous traveling conditions may exist over elevated roadways.
2:23 a.m. Troop C receives a report of icing on an overpass on Highway 90 just west of the Terrebonne Parish line. The Troop C station log confirms that this information was contemporaneously communicated to the Lafayette office for DOTD, but the log contains no indication that the information was communicated to the Houma DOTD facility for Terrebonne Parish.
2:29 a.m. The National Weather Center issues another bulletin confirming that a winter weather advisory is in effect, but no accumulation of sleet is expected through the early morning hours, and hazardous road conditions are not expected through 4:00 a.m.
2:54 a.m. A “little bit” of icing is reported on the Twin Span Bridge in Houma. The Troop C station log contains no indication that this information was reported to any office of DOTD.
3:06 a.m. Troop C receives a report of icing on the elevated sections of Highway 90. This information is communicated to several DOTD | (¡offices, including Bridge City, the 24-hour dispatch for the DOTD Houma facility-
3:15 a.m. Bridge City contacts Leonard Naville, the DOTD maintenance superintendent for Terrebonne Parish, and advises him of an accident and ice at the Highway 90 overpass for La. Highway 311, an intersection that is *326 about eleven miles north of the DOTD Houma facility.[1]
3:30 a.m. A six-person crew, including Naville, assembles at the DOTD facility in Houma. The entire crew leaves for the Highway 90/311 overpass in two vehicles, a dump truck previously loaded with sand and a pickup truck containing some barricades.
3:46 a.m. The crew arrives at the Highway 90/311 overpass. Shortly after arriving, Naville speaks to a state trooper at the scene who instructs Naville to close the overpass.
3:46 a.m.— The crew spends about one hour sanding and barricading the Highway 4:46 a.m. 90/311 overpass. The crew then returns to the DOTD facility to retrieve more barricades.
5:00 a.m. The crew arrives back at the DOTD facility and begins loading barricades.
5:10 a.m. The subject accident occurs on Prospect Bridge.
5:30 a.m. The crew finishes loading trucks with barricades and departs for Highway 90.
The formation of ice on Prospect Bridge and DOTD’s notice, if any, of that ice was a contested issue at trial. Ed Roy was tendered by plaintiffs without objection as an expert in meteorology. He testified that the weather conditions during Christmas of 2004 were a classic example of how freezing precipitation can develop in south Louisiana: a wedge of cold air is located below moisture being produced by a low pressure system that moved in from the Gulf of Mexico. Roy confirmed that the weather over the entire upper Terrebonne Parish area, which includes Houma, was uniform, so all bridges in that area would have iced over at approximately the same time. Roy opined that if elevated sections of Highway 901 yjust west of the parish line were icing by 2:20 a.m., then Prospect Bridge was also icing over at approximately the same time. Dr. Olin Dart Jr., a civil engineer retained by plaintiffs and accepted by the trial court as an expert in the field of traffic engineering and safety, similarly agreed that if ice was on the elevated sections of Highway 90, then one should expect ice to be on Prospect Bridge.
Naville’s supervisor, Stan DiGiovanni, confirmed that the report of ice on the Highway 90/311 overpass at 3:15 a.m. was a "warning sign” that there could be ice on the other priority bridges and overpasses. If elevated portions of Highway 90 had ice and the weather was uniform over the area, then, according to DiGiovanni, it was “[v]ery possible” that Prospect Bridge also had ice on it. DiGiovanni agreed that ice on the nearby Twin Span Bridge, which was reported to the state police at 2:54 a.m., was consistent with the likelihood that ice had formed on Prospect Bridge about the same time as the elevated sections of Highway 90. Naville agreed with DiGiov-anni that ice on elevated sections of Highway 90 meant there could be ice on Prospect Bridge.
DiGiovanni’s supervisor at the time of the accident, Roland Maurin, testified that whenever Naville receives a report of ice on an area roadway, he should inspect the bridges in his area. Similar testimony was also offered by Michael Stack, the current administrator for the district that includes Terrebonne Parish.
Vernon Tekell Jr., a civil engineer retained by DOTD, was accepted as an expert in traffic engineering and safety, and *327 testified that different bridges tend to freeze over at different rates, depending on their orientation to the prevailing winds, the height of the span, the type of structure, and the surrounding terrain. However, Tekell did not identify any distinguishing feature about Prospect Bridge that would slow the icing process on that structure, nor did he testify that the bridge did not have ice on the day of the accident or that the ice had formed later Isthan suggested by plaintiffs’ experts. Te-kell recognized that Prospect Bridge is actually taller relative to surrounding terrain than the Highway 90 overpasses, and that Prospect Bridge was “likely to ice; so they should check it, yes.”
In addition to the notice issue, the reasonableness of DOTD’s response to the icy conditions was a point of contention at trial. Naville initially testified that when Bridge City contacted him at 3:15 a.m., he was advised that there was an accident at the Highway 90/311 overpass and sand was needed. When plaintiffs’ counsel confronted Naville with his prior deposition testimony indicating that he was told to close the roadway, Naville confirmed that he was told to close the intersection because of ice and an accident.
Shortly after arriving at the Highway 90/311 overpass, Naville spoke to a state trooper who instructed Naville to close the roadway. Although Naville acknowledged at trial that there was no need to sand the overpass, the crew nevertheless sanded the location for an hour, which Naville confirmed was a “waste of time.” Naville also testified that he had enough personnel to divide the crew. He could have sent two groups to close Highway 90 and one crew to close the priority bridges. According to Naville, if he had divided the personnel in that manner at either 3:30 a.m. (when they arrived at the DOTD facility in Houma) or 3:46 a.m. (when they were told by the state trooper to close Highway 90), then Prospect Bridge would have been closed prior to the accident.
Elisia Wyre, the foreman reporting to Naville, testified that Naville called her shortly after 3:00 a.m. and advised that they needed to get the barricades and close the bridges because of icing. Mindful that ice was forming on Highway 90, Wyre avoided overpasses when she drove to the DOTD office in Houma. Once at the office, the entire crew went to the Highway 90/311 overpass in two trucks. IsAfter arriving, they threw sand on the overpass and set up barricades, then returned to the office to get more barricades.
Naville’s supervisor, DiGiovanni, testified that he would have split the crew if he was told to close the Highway 90/311 overpass. However, DiGiovanni disputed that Naville had been told either by Bridge City or the state trooper to close the overpass prior to sanding it. Instead, DiGiovan-ni suggested that Naville must have been told to close the overpass only after the crew had sanded it. Otherwise, according to DiGiovanni, it would be “very foolish” to bring a sand truck to an overpass that was to be closed.
Dart, the expert in traffic engineering and safety called by the plaintiffs, had no criticism of Naville assembling a team of six people at the Houma office by 3:30 a.m. However, Dart found multiple missteps thereafter. According to Dart, Naville should have divided his crew into two or three groups and sent them to different priority locations to close the sites. After driving the routes himself and allowing ten to fifteen minutes to barricade each priority location, Dart calculated that two crews of three people, or three crews of two people, could have closed all of the priority locations before the subject accident occurred at 5:10 a.m. Recognizing that Highway 90 was the top priority, at least one *328 crew (or two crews if a total of three crews were formed) could have focused on closing Highway 90, while the remaining crew secured the other priority locations. Depending on which alternative was used, Prospect Bridge could have been closed as early as 4:17 a.m. and as late as 4:49 a.m.
Dart stated that Naville had two opportunities to divide his crew and timely secure all of the priority locations, the first opportunity being at 3:30 a.m. when the personnel met at the DOTD facility in Houma, and the second opportunity being at 3:46 a.m. when they arrived at the accident location and were told by the state | mtrooper to close, rather than sand, Highway 90. Dart was particularly critical of Naville’s decision to bring a sand truck to the Highway 90/311 overpass and sand the overpass for an hour. Given the conditions, according to Dart, the only reasonable thing to do was barricade and close the overpasses and bridges.
Tekell, DOTD’s expert, acknowledged that Dart’s proposal was probably a “better way” to address the situation, but Te-kell believed that Naville’s actions were reasonable under the circumstances. While a crew generally should be split up to cover the most area in the least amount of time, Tekell stated the decision depends on the circumstances and information available to the foreman in each particular instance. According to Tekell, Naville knew he had an accident on his highest priority road, with a state trooper waiting on him at the scene, so he took his crew to that location. Multiple employees would be needed to assist in sanding the overpass.
However, Tekell’s opinion was based on his belief that Naville was not told to close the Highway 90/311 overpass until after he and his crew had sanded it for an hour. Like DiGiovanni, Tekell believed that Na-ville would not have brought a sand truck to the location and sanded it for an hour if he had previously been told to close the overpass. If, however, Naville was told to close the overpass in the telephone call from Bridge City or shortly after he arrived at the scene, then, according to Te-kell, Naville’s response “was not reasonable.”
After taking the matter under advisement, the trial court issued written reasons finding in favor of plaintiffs. The trial court concluded that DOTD had constructive notice of icy conditions on Prospect Bridge no later than 3:15 a.m. on December 25, 2004. In reaching that conclusion, the trial court noted the records of the Louisiana State Police and the testimony of DOTD employees, particularly lnDiGiovanni and Wyre, indicating their awareness of the likelihood that Prospect Bridge had iced over when the elevated sections of Highway 90 had iced over.
In extensive reasons, the trial court addressed the response by DOTD, and more specifically the actions of Naville, as follows:
In assessing the reasonableness of DOTD’s actions in response to its constructive knowledge, the court has considered the time available to DOTD to address the situation it faced, and the decisions made under the circumstances.
Mr. Naville, who had direct responsibility for responding to the crisis, chose to take his entire maintenance crew to one problem area and spent the entirety of the approximately two hours available to him before the accident addressing that single geographic area. He could have easily sent two members of his crew with sufficient equipment to barricade the Prospect Street overpass, the Dularge Bridge overpass, and the Houma Twin Span overpass before having those crew members join the *329 others in the distant area of Highway 90. The three overpasses mentioned are all located less than five minutes from each other and all three overpasses are within less than five minutes from the DOTD facility on South Van Avenue in Houma. All three overpasses could have easily been barricaded in less than forty-five minutes, including travel time. Had this course of action been undertaken, the Prospect Street overpass would have been barricaded well before 4:30 a.m., at least one-half hour before the accident.
Instead, Mr. Naville decided to devote all of his resources to the Highway 90 interchanges. The court understands that Highway 90 had numerous interchanges and that the speed of 70 m.p.h. permitted on that roadway logically made it a priority for DOTD when ice developed. However, the court also notes at the time events required emergency action by DOTD, Highway 90 was already being controlled and monitored by the Louisiana State Police. It was simply, unreasonable for Mr. Naville to have neglected the overpasses that could have been so easily and so quickly closed.
The court’s view is shared by Dr. Olin K. Dart, Jr., the expert in traffic engineering and safety who testified on behalf of the plaintiffs. With constructive notice of icy conditions on all of the overpasses in Tere-bonne Parish, it seems that Mr, Naville chose to respond by the most unreasonable option available to him.
For all of the foregoing reasons, the court finds that DOTD is answerable in damages to both Mr. Greene and the parents of Mr. Alvarado.
In a judgment signed on May 12, 2015, the trial court awarded Greene damages in the total amount of $953,977.03, and awarded damages in the amount |12of $100,000.00 to each of Alvarado’s parents.[2] On May 20, 2015, DOTD filed a motion for new trial seeking to have the judgment amended to reduce Greene’s general damage award to the statutory maximum of $500,000.00 pursuant to Louisiana Revised Statute 13:5106(B)(1). On May 21, 2015, Greene filed a pleading captioned “Motion to Amend Judgment to Conform to Louisiana Revised Statute 13:5106,” requesting that the judgment be amended to include an award of future medical expenses. After consideration of those motions, the trial court signed a judgment on August 14, 2015, modifying the previous judgment to include an award of future medical expenses to Greene in the amount $50,000.00 and to reduce his award of general damages to $500,000.00.[3]
On appeal, DOTD asserts that the trial court: (1) erred in failing to accept Tekell as an expert in road maintenance under snow and ice conditions, (2) erred in find *330 ing that DOTD had constructive notice of ice on all overpasses and bridges in Terre-bonne Parish prior to the accident, (3) misinterpreted the elements of Louisiana Revised Statute 9:2800 and erred in finding that DOTD’s personnel were negligent, and (4) erred in awarding future medical expenses to Greene. In a separate assignment of error and in an exception filed with this court, DOTD also asserts that it is immune from liability under Louisiana Revised Statute 9:2798.1, which provides immunity to public entities for policymak-ing or discretionary acts.[4]
JjDISCUSSION

Immunity for Policymaking or Discretionary Acts

DOTD maintains that the actions undertaken to address the icy travel conditions were policymaking or discretionary acts subject to immunity under Section 9:2798.-IB. Pursuant to that statute, liability shall not be imposed on public entities or their officers or employees “based upon the exercise or performance or the failure to exercise or perform their policymaking or discretionary acts when such acts are within the course and scope of their lawful powers and duties.”
In Fowler v. Roberts, 556 So.2d 1 (La. 1989) (on rehearing), the supreme court devised a two-step test to determine whether a public entity is entitled to immunity under Section 9:2798.1B. First, if a statute, regulation, or policy prescribes a particular course of action, there is no choice or discretion involved, and the immunity does not apply. See Fowler, 556 So.2d at 15. However, when discretion is involved, the court must then determine whether that discretion is the kind that is shielded by the statutory immunity, that is, discretion grounded in social, economic or political policy. See Fowler, 556 So.2d at 15. Section 9:2798.1 protects the government from liability only at the policy making or ministerial level, not at the operational level. See Fowler, 556 So.2d at 15; Bozeman v. Reed, 92-0858 (La. App. 1 Cir. 3/11/94), 633 So. 2d 944, 956, writs denied, 94-0840, 94-0862, 94-0884 (La. 6/24/94), 640 So. 2d 1345.[5]
| uDOTD has a duty to continually maintain the public roadways in a condi-
*331 tion that is reasonably safe and does not present an unreasonable risk of harm to the motoring public exercising ordinary care and reasonable prudence. See La. R.S. 48:21 A; Fontenot v. Patterson Insurance, 09-0669 (La. 10/20/09), 23 So.3d 259, 270. This court has previously held that any decision regarding the manner in which the roads are made reasonably safe is operational in nature, and Section 9:2798.1 does not provide immunity for liability stemming therefrom. See Chaney for Use & Benefit of Chaney v. National Railroad Passenger Corporation, 583 So.2d 926, 929 (La. App. 1 Cir. 1991); Valet v. City of Hammond, 577 So.2d 155, 167 (La. App. 1 Cir. 1991). DOTD cannot decide what level of maintenance to provide; it must maintain the road in a reasonably safe condition. Valet, 577 So.2d at 166. As explained by this court in Chaney:
If this were not so, governmental entities charged with maintaining roadways in a reasonably safe condition would be granted immunity for wholesale dereliction of this duty, based only on the notion that whether or not to place traffic controls at a particular intersection, etc., is a policy decision.
Chaney, 583 So.2d at 929-30.
Here, DOTD does not dispute that is has a duty to maintain the Prospect Bridge in a reasonably safe condition. Decisions and actions undertaken in the attempt to fulfill that duty in the hours preceding the subject accident are operational in nature, not policy-making or discretionary for which Section 9:27981.1 provides immunity. See Chaney, 583 So.2d at 930; Valet, 577 So.2d at 167. For these reasons, we deny the exception of no cause of action and find no merit to the related assignment of error relying upon Section 9:2798.1.

Qualification of Expert Witness

I15DOTD next maintains that the trial court erred in failing to accept Tekell as a traffic engineer with special expertise in iced roadways. DOTD tendered Tekell as an expert in “traffic engineering and safety which includes design, construction, and maintenance of highways and special expertise in developing plans and maintaining roadways under icy conditions.” (Emphasis added.) The trial court accepted Tekell as tendered except for the purported special expertise in icing conditions.
Tekell is a civil engineer who specializes in traffic and transportation. He worked for the City/Parish of Lafayette from 1981 through 1998, and thereafter has maintained a private consulting firm. During his sixteen-year tenure in the public sector, Tekell was involved in the city/parish government’s handling of three ice events that he considered notable. Other than those experiences, he has not had any specialized training or education related to design, planning, or maintenance during an ice event, except for a two-hour seminar in 1985. Tekell has not published any articles or taught any seminars on the subject, and he has never previously been qualified as having specific expertise in that area. When DOTD tendered Tekell as a traffic expert with special expertise in iced events, the trial court stated:
He may very well be able to express his opinion as an expert in those matters. I just don’t know if it’s critical that I declare that he is an expert with some special expertise under icy conditions.
Tekell was accepted as an expert in traffic engineering and safety, including design, construction, and maintenance of highways. He testified about the formation of ice on roadways and the reasonableness of DOTD’s response in the present case. The trial court sustained only one objection during Tekell’s testimony: when he *332 was asked to define the phrase “historic storm,” which he had used to describe the weather on the day of the accident. After sustaining the | ^objection, the trial court stated, “I don’t need an expert to tell me that ice doesn’t occur that often.”
A trial court is accorded broad discretion in determining whether expert testimony should be held admissible and who should or should not be permitted to testify as an expert. Cheairs v. State ex rel. Department of Transportation and Development, 03-0680 (La. 12/3/03), 861 So.2d 536, 541. Whether a witness meets the qualifications of an expert witness and the competency of the expert witness to testify in specialized areas is within the discretion of the trial court. See Cheairs, 861 So.2d at 541; Crowe v. Pearl River Polymers, Inc., 12-1323, 2014 WL 7454995 at *6 (La. App. 1 Cir. 12/30/14). A trial court’s decision to qualify an expert will not be overturned absent an abuse of discretion. Johnson v. Morehouse General Hospital, 10-0387 (La. 5/10/11), 63 So.3d 87, 99.
We find no abuse of discretion by the trial court. The trial court accepted Tekell as an expert in traffic engineering and safety. Tekell acknowledged his limited training and experience in iced roadways, but he nevertheless was allowed to render opinions on the condition of the roadways and the appropriateness of DOTD’s response. The trial court’s description of Te-kell’s accepted area of expertise was largely a matter of semantics, as the record reflects no substantive limitation on the scope of his testimony. This assignment of error has no merit.

Burden of Proof and Standard of Review

DOTD’s next assignments of error focus on elements of plaintiffs’ burden of proof, specifically whether they sufficiently proved that DOTD had actual or constructive knowledge of the ice on Prospect Bridge, and, if so, whether DOTD failed to take corrective measures within a reasonable time.
DOTD has a duty to continually maintain the public roadways in a condition that is reasonably safe and does not present an unreasonable risk of harm to the |17motoring public exercising ordinary care and reasonable prudence. See La. R.S. 48:21 A; Fontenot, 23 So.3d at 270. This duty, however, does not render DOTD the guarantor of the safety of all of the motoring public or the insurer for all injuries or damages resulting from any risk posed by obstructions on or defects in the roadway or its appurtenances. Forbes v. Cockerham, 08-0762 (La. 1/21/09), 5 So.3d 839, 858.
Although a claim against DOTD for an accident caused by ice on a roadway is based in negligence rather than strict liability, the distinction between those theories of recovery was effectively eliminated in 1985 by the enactment of Louisiana Revised Statute 9:2800, which requires proof of actual or constructive notice of a defect in a strict liability claim against a public entity. See Lee v. State Through Department of Transportation and Development, 97-0350 (La. 10/21/97), 701 So.2d 676, 677-78; Rhodes v. State Through Department of Transportation and Development, 95-1848 (La. 5/21/96), 674 So.2d 239, 242; Morris v. State, Department of Transportation., 94-2545 (La.App. 1 Cir. 10/6/95), 664 So.2d 1192, 1195, writ denied, 95-2982 (La. 2/9/96), 667 So.2d 537 (recognizing that a claim for ice on a roadway is based in negligence). The burden of proof is now the same under either theory: the plaintiff must prove (1) DOTD had custody of the thing that caused the plaintiffs injuries or damages, (2) the thing was defective because it had a condition that created an unreasonable risk of harm, (3) DOTD *333 had actual or constructive knowledge of the defect and did not take corrective measures within a reasonable time, and (4) the defect in the thing was a cause-in-fact of the plaintiffs injuries. See Fontenot, 23 So.3d at 267-68; Lee, 701 So.2d at 677-78.
DOTD’s argument focuses on the trial court’s findings that DOTD had constructive knowledge of ice on Prospect Bridge and failed to take corrective | ^measures within a reasonable time. At the outset we note that these determinations are factual findings subject to the manifest error standard of review. See Brooks v. State ex rel. Department of Transportation and Development, 10-1908 (La. 7/1/11), 74 So.3d 187, 190; Campbell v. Louisiana Department of Transportation and Development, 94-1052 (La. 1/17/96), 648 So.2d 898, 902; Cotton v. State Farm Mutual Automobile Insurance Company, 10-1609 (La.App. 1 Cir. 5/6/11), 65 So.3d 213, 217, writ denied, 11-1084 (La. 9/2/11), 68 So.3d 522; Murphree v. Daigle, 02-1935 (La.App. 1 Cir. 9/26/03), 857 So.2d 535, 537, writ denied, 03-2927 (La. 1/9/04), 862 So.2d 990.
The supreme court recently reaffirmed that under the manifest error standard of review, a reviewing court may not merely decide if it would have found the facts of the case differently. Hayes Fund for First United Methodist Church of Welsh, LLC v. Kerr-McGee Rocky Mountain, LLC, 14-2592, 193 So.3d 1110, 1115 (La. 12/8/15); see also Hall v. Folger Coffee Company, 03-1734 (La. 4/14/04), 874 So.2d 90, 98. Rather, in reversing a trial court’s factual conclusions, the appellate court must satisfy a two-step process based on the record as a whole: there must be no reasonable factual basis for the trial court’s conclusion, and the finding must be clearly wrong. Hayes, 193 So.3d at 1115-16; Stobart v. State through Department of Transportation and Development, 617 So.2d 880, 882 (La. 1993). This test requires a reviewing court to do more than simply review the record for some evidence that supports or controverts the trial court’s findings. The court must review the entire record to determine whether the trial court’s finding was clearly wrong or manifestly erroneous. Hayes, 193 So.3d at 1116; Stobart, 617 So.2d at 882.
The issue to be resolved on review is not whether the trier of fact was right or wrong, but whether the factfinder’s conclusion was a reasonable one. SeeHayes, 193 So.3d at 1116; Stobart, 617 So.2d at 882. Where there are two permissible views of the evidence, the factfinder’s choice between them cannot be manifestly erroneous or clearly wrong. Hayes, 193 So.3d at 1116; Stobart, 617 So.2d at 883. The Hayes court, quoting an earlier opinion, summarized the deferential nature of this standard of review as follows:
The manifest error doctrine is not so easily broached. Rarely do we find a reasonable basis does not exist in cases with opposing views. We note it is not hard to prove a reasonable basis for a finding, which makes the manifest error doctrine so very difficult to breach, and this is precisely the function of the manifest error review. A reviewing court only has the “cold record” for its consideration while the trier of fact has the “warm blood” of all the litigants before it. This is why the trier of fact’s findings are accorded the great deference inherently embodied in the manifest error doctrine. So once again we say it should be a rare day finding a manifest error breach when two opposing views are presented to the trier of fact.
Hayes, 193 So.3d at 1117 (quoting Menard v. Lafayette Insurance Company, 09-1869 (La. 3/16/10), 31 So.3d 996, 1011).
With these principles in mind, we consider DOTD’s assignments of error challenging the trial court’s factual findings *334 that DOTD had constructive knowledge of the ice on Prospect Bridge and failed to take corrective measures within a reasonable time.
120Constructive Knowledge or Notice of Ice on Prospect Bridge[6]
Section 9:2800D defines “constructive notice” as “the existence of facts which infer actual knowledge.” Constructive knowledge may be shown by facts demonstrating that the defect or condition has existed for such a period of time that it would have been discovered and repaired had the public body exercised reasonable care. See Brown v. City of Madisonville, 07-2104 (La.App. 1 Cir. 11/24/08), 5 So.3d 874, 882, writ denied, 08-2987 (La. 2/20/09), 1 So.3d 498; Morris, 664 So.2d at 1196; Ambrose v. City of New Iberia, 08-1197 (La.App. 3 Cir. 4/1/09), 11 So.3d 34, 38, writ not considered, 09-1843 (La. 11/6/09), 21 So.3d 314.[7] A public entity has constructive knowledge if it “knew or should have known” of the defective condition. See Stobart, 617 So.2d at 885; Whitley v. Baton Rouge General Medical Center, 13-1590, 2014 WL 3606079, p. 6 (La. App. 1 Cir. 5/29/14); Adams v. Parish of East Baton Rouge, 00-0424 (La.App. 1 Cir. 11/14/01), 804 So.2d 679, 690, writ denied, 02-0448 (La. 4/19/02), 813 So.2d 1090. While DOTD cannot be imputed with knowledge of every defect on its roadways and shoulders, neither can DOTD escape liability by negligently failing to discover that which is easily discoverable. Goza v. Parish of West Baton Rouge, 08-0086 (La. App. 1 Cir. 5/5/09), 21 So.3d 320, 329, writ denied, 09-2146 (La. 12/11/09), 23 So.3d 919, cert. denied, 560 U.S. 904, 130 S.Ct. 3277, 176 L.Ed.2d 1184 (2010); see also Chaney, 583 So.2d at 929-30.
J^jHere, the dispute is not whether ice formed on Prospect Bridge, but rather what time the ice formed and, more importantly, whether DOTD had constructive knowledge of the ice. Roy, the meteorologist called by the plaintiffs, testified that, given the uniformity of the weather event over the region, Prospect Bridge began icing over at about 2:20 a.m., which is the approximate time that Troop C received the first report of icing for the elevated sections of Highway 90 just west of Terre-bonne Parish. Dart agreed that if ice was on the elevated sections of Highway 90, then one should expect ice to be on Prospect Bridge. At 2:54 a.m., Troop C received a report of icing on the Twin Span Bridge, which is located in Houma about two and one-half miles from the Prospect Bridge. While Tekell testified that bridges freeze over at different rates, he did not offer an opinion as to when, or if, ice formed on Prospect Bridge. Collectively, the evidence in the record reasonably supports the conclusion that ice formed on Prospect Bridge at some point before 3:00 a.m.
A more difficult issue is whether DOTD had constructive knowledge of the ice on Prospect Bridge. In the telephone call from the state police shortly after 3:00 a.m., DOTD received actual knowledge of *335 ice on the Highway 90/311 overpass, located about eleven miles north of Prospect Bridge in Houma. DiGiovanni acknowledged that ice at that location is a “warning sign” that there could be ice on the other priority bridges and overpasses; and, in a uniform weather event, it was “[v]ery possible” that Prospect Bridge had ice on it under those circumstances. Na-ville agreed with DiGiovanni. Because of the report of ice on Highway 90, Wyre avoided overpasses when she drove to the Houma facility shortly after 3:00 a.m. Multiple DOTD supervisory personnel also acknowledged that the report of ice on the Highway 90/311 overpass triggered a duty to inspect the other priority bridges. Similarly, Tekell conceded that “once you get one | ¡^bridge iced up, then you should probably start checking your others,” and that Prospect Bridge was “likely to ice; so they should check it, yes.”
DOTD cites McGaskey v. National Automotive Insurance Co., 08-511 (La.App. 3 Cir. 11/26/08), 998 So.2d 788, writ denied, 09-0459 (La. 4/13/09), 5 So.3d 171, for the proposition that the mere possibility of icy conditions does not equate to constructive notice. In that case, the trial court found that DOTD did not have constructive notice of ice on a bridge in Natchitoches Parish, where no weather forecast had predicted conditions that would result in ice forming on bridges in the area, and law enforcement had not received any calls of ice on the bridge before the subject accident. McGaskey, 998 So.2d at 791-92. Applying the manifest error standard of review, the court of appeal found “a reasonable factual basis” to support the trial court’s determination that DOTD did not have constructive notice of the ice on the bridge under those circumstances. In contrast, the icy conditions on day of the accident in this case were not unexpected, and DOTD had been advised that ice had formed on elevated roadways in and around Terrebonne Parish before the accident.
DOTD also cites McGaskey for the proposition that it does not have a duty to monitor weather conditions and inspect bridges for ice. The McGaskey court recognized that “DOTD is not required to inspect its roads and bridges in anticipation of the formation of ice absent weather predictions including such.” McGaskey, 998 So.2d at 792. Here, the weather forecast included the possibility of icing on bridges. More importantly, the record includes testimony from supervisory DOTD personnel, as well as from the defense expert, that DOTD had a duty to inspect the bridges for ice once it received a report of ice on an elevated roadway in the area. The duty identified by these witnesses was not triggered by |23the mere anticipation of ice, but by the fact that DOTD was aware that ice had already formed on a bridge in the area.
DOTD relies upon several other cases involving accidents allegedly caused by ice or water on a roadway or bridge. See Nix v. Brasly, 489 So.2d 1038, 1042 (La. App. 1 Cir. 1986); Roberson v. State Through Department of Transportation and Development, 550 So.2d 891 (La. App. 2 Cir.), writ denied, 552 So.2d 387 (La. 1989); and McKinnie v. Department of Transportation and Development, 426 So.2d 344 (La. App. 2 Cir.), writ denied, 432 So.2d 266 (La. 1983). In each of these cases, DOTD was absolved from liability because it did not have notice of the hazardous condition, or it did not have notice in sufficient time to prevent the accident. We find each of these cases factually distinguishable.
In Roberson, the court of appeal noted that the wintery weather was “absolutely unexpected” and that the “record simply does not establish that DOTD had good reason to expect icing conditions.” Rober *336 son, 550 So.2d at 896-97. The first indication of any approaching adverse weather was a weather bulletin issued at 2:30 a.m. on the morning of the accident. Roberson, 550 So.2d at 893. The court of appeal explained that DOTD is not under a duty to constantly monitor weather advisories unless it is aware that dangerous conditions are imminent. Roberson, 550 So.2d at 896. Upon learning of the conditions, a supervisor was dispatched to inspect the bridges and elevated roadways, and found ice beginning to form on a bridge railing at 4:15 a.m. Crews were immediately called out and salt trucks were loaded, but the crews were unable to begin salting the roadways before the accident occurred at approximately 5:00 a.m., about 45 minutes after the first notice of ice. See Roberson, 550 So.2d at 893, 897.
In McKinnie, a motorist lost control of her vehicle when she encountered ice or water on a roadway. McKinnie, 426 So.2d at 345. The trial court denied a 124claim against DOTD, and the court of appeal affirmed, finding, in relevant part, that DOTD did not have actual or constructive notice of the substance on the roadway. McKinnie, 426 So.2d at 349. In reaching that conclusion, the court pointed out that no weather forecasts were introduced to show DOTD had notice of any weather sufficient to cause water or ice to form in the roadway, and DOTD officials had never received any reports of ice on the road in that area at any time. McKinnie, 426 So.2d at 349.
In Nix, the court of appeal rejected the plaintiffs argument that DOTD had constructive notice of ice on a bridge as a result of a DOTD employee encountering ice on a bridge 10 miles to the north. Nix, 489 So.2d at 1044. In affirming the trial court, the court of appeal reasoned that ice on a bridge approximately ten miles away did not necessitate a conclusion that there was ice on the subject bridge, noting that the record indicated that many factors may affect when or if a bridge will ice over. Nix, 489 So.2d at 1044.
In contrast to those cases, the inclement weather in the present matter was not unexpected. Warnings had been issued days in advance, and weather bulletins confirmed in detail the approaching weather. The record contains evidence that ice had formed on Prospect Bridge before 3:00 a.m. on the morning of the accident. DOTD personnel were aware that ice had been reported on the Highway 90/311 overpass at 3:06 a.m. That ice, according to the DOTD personnel, was a warning sign of ice on Prospect Bridge, and should have prompted an inspection of the bridge. This evidence, particularly when reviewed under a manifest error standard of review, distinguishes this case from Nix, Roberson, and McKinnie,
After a thorough review of the evidence, under the applicable standard of review, we cannot say the trial court was manifestly erroneous in concluding that |gsDOTD had constructive knowledge of ice on Prospect Bridge no later than 3:15 a.m.[8] This *337 assignment of error has no merit. Reasonableness of Response by DOTD
DOTD next argues that the trial court erred in failing to consider whether DOTD had a reasonable opportunity to assess and close Prospect Bridge before the accident. According to the defendant, the trial court, with the benefit of hindsight, merely found that better methods were available to respond to the situation, rather than finding DOTD’s response unreasonable.
In its reasons for judgment, the trial court stated that in “assessing the reasonableness of DOTD’s actions in response to its constructive knowledge, the court has considered the time available to DOTD to address the situation it faced, and the decisions made under the circumstances.” DOTD had slightly less than two hours to respond to the icy conditions before the accident occurred on Prospect Bridge. Dart identified multiple methods of utilizing the available personnel that would have resulted in the closure of all priority locations before the subject accident. While this testimony establishes an opportunity to remedy the defect, we agree with DOTD that merely identifying a better method to respond to the situation is not tantamount to proving that DOTD breached its duty to maintain the roadway in a reasonably safe condition. To establish a breach of that duty, 12nplaintiffs were required to prove that the corrective measures undertaken by DOTD were not reasonable.
In addition to Naville’s failure to divide his crew, Dart opined that Naville should not have brought a sand truck to the Highway 90/311 overpass and sanded the overpass for an hour. The only reasonable thing to do under the circumstances, according to Dart, was barricade and close the overpasses and bridges. Naville admitted that there is no need to sand an intersection that is closed due to ice, and he struggled to explain why he and his crew sanded the Highway 90/311 overpass for approximately one hour. Naville acknowledged that to sand under those circumstances was a “waste of time.”
While Tekell disagreed with Dart’s opinion about the reasonableness of Naville’s actions, Tekell based that opinion on his belief that Naville was told to sand, rather than close, the Highway 90/311 overpass in the initial telephone call from Bridge City and by the state trooper when Naville arrived at the scene. The substance of Naville’s testimony about those two communications is therefore critical, not only to Tekell’s opinion, but to our determination of whether the record contains a reasonable basis for the trial court’s conclusion that DOTD failed to take reasonable corrective measures upon learning of the iced roadways.
Naville initially testified that Bridge City informed him of the accident and that “Troop C wanted some sand at that address.” In a follow up question, Naville again stated that he was instructed to bring sand to the intersection. Plaintiffs’ counsel then presented Naville with his prior deposition testimony wherein he stated that Bridge City informed him of the accident and that the road needed to be closed. Naville was then asked at trial:
Q. You were told to close; correct? You were told to close; correct?
A. Correct.
|27In later exchanges, Naville again confirmed:
*338 Q. Now we know that you got the call at 3:15 a.m. that Highway 90 and 311 needed to be closed because of ice and sand; correct?
A. Yes, sir.
⅜ ⅜ ⅜
Q. [J]ust to clarify some things, you got the phone call from Bridge City at 3:15 a.m. on December 25th, ’04 to close Highway 90 and 311 because of ice and an accident?
A. Yes, sir.
[[Image here]]
Q. [J]ust to make sure that when the dust settles, at 3:15 a.m., you got the call from Bridge City to close Highway 90 and 311 because of ice and an accident; correct?
A. Yes, sir.
This testimony was corroborated by Wyre, who said Naville contacted her shortly after 3:00 a.m. with instructions to get the barricades and close the bridges because of icing. Naville also testified that when he and the other crew members arrived at the accident scene, the state trooper told him to close the road.
Despite being present for this testimony, Tekell refused to accept that Naville had, in fact, been told to close the overpass in the telephone call from Bridge City or by the state trooper when Naville arrived at the scene. Tekell could not reconcile that information with Naville’s decision to bring a sand truck to the scene and to sand the overpass for approximately one hour. When pressed, Tekell stated:
Well, if you ask me to accept the fact that he was told to close, then I would have to say his response was not reasonable if he was told to close instead of respond to an incident.
Tekell later added, “If he was told to close when he got there, he shouldn’t spend time sanding.”
|gSThe trial court was confronted with evidence that Naville wasted a significant amount of time, during a critical part of the response, unnecessarily sanding an overpass that he had been instructed to close. Although Tekell and other witnesses offered alternative explanations for Na-ville’s actions, our role in reviewing the trial court’s judgment is not to decide if we would have found the facts of the case differently. See Hayes, 193 So.3d at 1115; Hall, 874 So.2d at 98. Rather, we must determine whether a reasonable factual basis exists for the trial court’s conclusion that DOTD failed to reasonably respond to the icy conditions. Hayes, 193 So.3d at 1115-16; Stobart, 617 So.2d at 882. Where there are two permissible views of the evidence, the factfinder’s choice between them cannot be manifestly erroneous or clearly wrong. Hayes, 193 So.3d at 1116; Stobart, 617 So.2d at 883.
While we understand and appreciate the reality that many times we would have judged the case differently had we been the factfinder, that is not our function as a reviewing court. See Hayes, 193 So.3d at 1116. After consideration of all of the evidence in the record, we find a reasonable factual basis for the trial court’s conclusion that DOTD failed to take reasonable corrective measures after acquiring constructive knowledge of the ice on Prospect Bridge.[9] The assignments of error challenging this finding have no merit.
*339 | ^Future Medical Expenses
In its final assignment of error, DOTD asserts that the trial court erred in awarding future medical expenses to Greene in response to a motion to amend the judgment. DOTD contends that the May 12, 2015 judgment was final and could not be substantively modified through a motion to amend.
Substantive amendments to judgments can be made only by consent of the parties or after a party has successfully litigated a timely application for new trial, an action for nullity, or a timely appeal. See La. Code Civ. Pro. art. 1951; Villaume v. Villaume, 363 So.2d 448, 451 (La. 1978); Sanderford v. Mason, 12-1881 (La.App. 1 Cir. 11/1/13), 135 So.3d 745, 749. Otherwise, a trial court lacks authority to make any modifications of substance to a final judgment. Sanderford, 135 So.3d at 749. When the substance of a judgment has been improperly amended, the amending judgment is annulled and set aside, and the original judgment is reinstated. Sanderford, 135 So.3d at 749.
Although Greene’e pleading was captioned “Motion to Amend,” the characterization of a pleading by the litigant is not controlling. State, Department of Children and Family Services, ex rel. A.L. v. Lowrie, 14-1025 (La. 5/5/15), 167 So.3d 573, 578; Lane v. Lane, 15-1572, 2016 WL 770832, p. 2 (La. App. 1 Cir. 2/26/16). Courts should look through the caption of pleadings in order to ascertain their substance and to do substantial justice to the parties. Smith v. Cajun Insulation, Inc., 392 So.2d 398, 402 n. 2 (La. 1980); Southeastern Louisiana University v. Cook, 12-0021 (La.App. 1 Cir. 9/21/12), 104 So.3d 124, 127-28; see also La. Code Civ. Pro. art. 865.
Inconsistent with these principles, a pleading is considered a motion for new trial if it requests a substantive modification of the judgment and is filed within the delays applicable to a motion for new trial. See Katz v. Katz, 412 So.2d 1291, 1293 (La. 1982) (motion to amend a judgment to add language dismissing certain defendants constituted a motion for new trial); Lane v. Lane, 2016 WL 770832 at p. 2 (rule to show cause seeking substantive modifications to custody judgment was construed as a motion for new trial); Town of Vinton v. Sonnier, 98-676 (La.App. 3 Cir. 10/28/98), 721 So.2d 992, 994, writ denied, 98-2972 (La. 1/29/99), 736 So.2d 836 (petition to modify a judgment held to be a motion for new trial); Rawls v. Domeray, 353 So.2d 414, 416 (La. App. 4 Cir. 1977) (rule to set aside a summary judgment deemed to be a motion for new trial).
Greene’s motion requested a substantive modification to the May 12, 2015 judgment, and it was filed within seven days, exclusive of legal holidays, of the notice of the judgment. Thus, the pleading is properly *340 construed as a motion for new trial. By acting on that motion, the trial court had the authority to substantively modify the May 12, 2015 judgment. DOTD does not otherwise challenge the award of future medical expenses. This assignment of error has no merit.
CONCLUSION
The exception of no cause of action filed on appeal by DOTD is denied, and the May 12, 2015 judgment, as modified thereafter in the August 14, 2015 judgment, is affirmed. Costs of this appeal in the amount of $21,517.00 are assessed to the State of Louisiana through the Department of Transportation and Development.
EXCEPTION DENIED; JUDGMENT AFFIRMED.

. Whether Bridge City instructed Naville to sand the overpass, as opposed to close it, is a point of contention in the litigation.

. On April 27, 2015, the trial court issued a document captioned "JUDGMENT,” but the signature page of the purported judgment had been inadvertently omitted and replaced by the signature page of the trial court’s written reasons, a mistake that was explained by the trial court in a preamble set forth in the May 12, 2015 judgment. Absent a valid signature, the document issued by the trial court on April 27, 2015, did not constitute a final judgment. See La. Code Civ. Pro. art. 1911.

. The trial court ordered that the future medical expenses be paid from the Future Medical Care Fund as provided in Louisiana Revised Statute 39:1533.2.

. DOTD also assigned as error the trial court’s denial of a motion for summary asserting that DOTD had no notice of ice on Prospect Bridge and was not negligent or at fault. This assignment of error was not briefed and is thus considered abandoned. See Uniform Rules, Courts of Appeal, Rule 2-12.4B(4); Cole v. Division of Administration, 14-0936 (La.App. 1 Cir. 1/26/15), 170 So.3d 180, 185, writ not considered, 15-0401 (La. 5/1/15), 169 So.3d 367.

. In a subsequent plurality opinion, the supreme court described Fowler’s analysis of Section 9:2798.1 as “faulty,” noting that the statute does not contain the phrase "grounded in social, economic or political policy,” nor does it distinguish between operational acts and policymaking acts. See Gregor v. Argenot Great Central Insurance Company, 02-1138 (La. 5/20/03), 851 So.2d 959, 967. Nevertheless, the Gregor court concluded that the governmental defendant in that case was not immune because the actionable conduct—a failure to properly train code enforcement personnel—"was not a decision grounded in social, economic, or political policy. It was operational negligence in enforcing the sanitary code.” Gregor, 851 So.2d at 968. The Gregor court thus based its decision on the same grounds articulated and applied in Fowler and its progeny. For additional cases recognizing this inconsistency in Gregor, see Herrera v. First National Insurance Company of America, 15-1097, 194 So.3d 807, 814 n.12 (La. App. 1 Cir. 6/3/16); McIntosh v. McElveen, 04-1041 (La.App. 3 Cir. 2/2/05), 893 So.2d 986, 994 n. 2, writ denied, 05-0528 (La. 4/29/05), 901 So.2d 1069. For this reason, we do not construe Gregor as overruling Fowler’s two-step test for the application of Section 9:2798.1.

. DOTD's assignment of error emphasizes that the trial court erroneously found that DOTD had constructive notice of ice on "all overpasses/bridges in Terrebonne Parish.” For purposes of this assignment of error and pursuant to the applicable law set forth herein, we focus our review on whether the trial court erred in finding that DOTD had constructive notice of ice on Prospect Bridge, the site of the subject accident.

. For a similar definition used in the context of merchant liability, see Louisiana Revised Statute 9:2800.6C(1) (defining “constructive notice,” in relevant part, to mean "that the condition existed for such a period of time that it would have been discovered if the merchant had exercised reasonable care”).

. Compare Morris v. State, Department of Transportation, 94-2545 (La.App. 1 Cir. 10/6/95), 664 So.2d 1192, 1196-98, writ denied, 95-2982 (La. 2/9/96), 667 So.2d 537 (trial court’s finding that DOTD had actual or constructive notice of iced roadway was not manifestly erroneous where several accidents had occurred over the stretch of roadway during an ice storm, and DOTD had not directed available personnel to inspect the area); Gaspard v. State, Through Department of Transportation and Development, 596 So.2d 336, 338 (La. App. 3 Cir.), writ denied, 600 So.2d 664 (La. 1992) (no manifest error in trial court’s judgment denying claim against DOTD where cold weather was predicted to arrive after the time of tire accident and law enforcement had received no calls of ice on the bridge); Moraus v. State, Through Department of Transportation and Development, 396 *337 So.2d 596, 599 (La. App. 3 Cir. 1981) (affirming trial court’s finding that DOTD had notice of an iced roadway where supervisor was informed by his superior that a freeze and icing of bridges were expected the next morning).

. Compare Morris, 664 So.2d at 1196-98 (no manifest error in trial court's determination that DOTD breached duty to motoring public by failing to remediate iced roadway); Luneau v. State ex rel. Department of Transportation and Development, 03-1064 (La.App. 3 Cir. 6/2/04), 879 So.2d 266, 272-73 (reversing trial court and finding no liability where DOTD received notice of ice thirty minutes before the accident, which, according to un- *339 contradicted testimony, was insufficient time to reach the scene); Welch v. State, Department of Transportation and Development, 93-1134 (La. App. 3 Cir. 5/4/94), 640 So.2d 596, 602, writ denied, 94-1452 (La. 9/23/94), 642 So.2d 1293 (affirming trial court judgment in favor of DOTD based on finding that twenty minutes from notice of ice until the accident was not sufficient opportunity to remedy the defect); Kenison v. Madison Industries, 597 So.2d 139, 142 (La. App. 5 Cir. 1992) (trial court’s finding that DOTD did not have notice of ice in sufficient time to prevent the accident was not manifestly erroneous where district office had received no reports of icing in the greater New Orleans area and icing conditions arose during a narrow window of time, at best approximately one hour); Coleman v. Houp, 319 So.2d 831, 834 (La. App. 3 Cir. 1975) (affirming trial court and holding that DOTD personnel acted reasonably after learning of ice on area bridges; court noted &at evidence established "it would have taken split-second timing in order for [superintendent] and his crew to have arrived at the scene in time” to prevent the accident).